**Freddie L. JOHNSON and Clara Johnson, Husband and Wife, Appellees and Cross-Appellants,**

v.

**UNITED STATES of America, Appellant and Cross-Appellee,**

v.

**Timothy B. HAY, Third Party Defendant.**

### Nos. 81-3467, 81-3493.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 9, 1982.

Decided May 3, 1983.

As Amended on Denial of Rehearing and Rehearing En Banc Aug. 2, 1983.

---

Tom L. Lewis, Regnier & Lewis, Great Falls, Mont., for Freddie L. and Clara Johnson.

Marilyn S.G. Urwitz, Dept. of Justice, Washington, D.C., for the U.S.

Before BROWNING, TUTTLE,* and RE-INHARDT, Circuit Judges.

TUTTLE, Circuit Judge:

## FACTS

Sergeant Freddie Johnson, a noncommissioned Air Force officer, is a quadraplegic as the result of injuries sustained in an automobile accident that occurred in the early morning hours of December 13, 1975. The automobile was owned and driven at the time of the accident by Air Force Sergeant Timothy Hay.

Hay and Johnson were on active duty in December 1975 and assigned to Malmstrom Air Force Base in Montana. During their off-duty hours, they were employed as bartenders at the Noncommissioned Officers Club ("NCO Club") located on the base.

After completing their normal eight hour tour of duty during the day, Hay and Johnson reported to work at approximately 6:00 p.m. on the evening of December 12, 1975. Air Force Sergeant William Provencher, Jr., night manager of the NCO Club, came on duty at approximately 9:00 p.m.

During the evening, the employees—including Hay, Johnson and Provencher—agreed to pool their tips and have an after-hours party at the NCO Club. One of the employees drove to an off-base liquor store to buy liquor for the party.

Under Montana law and military regulations, the NCO Club was required to close by 2:00 a.m. On December 13, 1975, Hay and Johnson clocked out shortly before 2:00 a.m., but remained at the Club. Provencher closed the NCO Club at 2:00 a.m., but did not clock out until 3:30 or 3:45 a.m. Hay remained at the Club until after all other employees had left the party. The party began shortly after 2:00 a.m. and lasted until about 4:30 a.m. Liquor consumed at the party came from the off-base store, but the employees used the Club's cups, ice and mixers.

Johnson and Hay left the NCO Club at 4:30 a.m. It was an extremely cold night. Johnson lived off-base, and Hay offered to drive him home. About one mile outside the entrance to the base Hay's car left the road and collided with a tree. Johnson sustained a severe injury to his neck that left him permanently and totally disabled.

Hay submitted to a blood alcohol test approximately two hours after the accident. Based on laboratory analysis of this test, the district court found that Hay was legally intoxicated at the time of the accident.

Johnson filed a Standard Form-95 ("SF-95") claim against the United States approximately eight months after the accident. The claim was in the amount of $3,500,000 and the injury alleged was quadraplegia. Johnson's wife Clara is identified on the claim as his spouse. Only Johnson signed the claim, however.

Johnson's claim was denied by the United States on February 22, 1977. Freddie and Clara Johnson then filed a complaint against the United States under the Federal Tort Claims Act ("FTCA" or "the Act"), Pub.L. No. 79–601, tit. IV, § 401, 60 Stat. 812 (1946) (codified in scattered sections of 28 U.S.C.) in Montana federal district court on April 13, 1977. Freddie Johnson prayed for $3,000,000 in damages for his injury, and Clara Johnson prayed for $500,000 damages for loss of consortium.

The United States joined Sergeant Hay as a third party defendant, but later moved to dismiss him with prejudice. The district court granted the government's motion.

The United States filed a motion for summary judgment on September 14, 1979. The government argued that it was not liable because Sergeant Hay had exceeded the scope of his employment, or, in the alternative, that the district court lacked jurisdiction under the *Feres* doctrine. The district court denied the motion, finding that there were triable issues of fact. The district court did not specifically address the *Feres* issue.

* Honorable Elbert P. Tuttle, Senior Judge, United States Court of Appeals for the Eleventh Circuit, sitting by designation.

Johnson's case was bifurcated for trial on the issues of liability and damages. At the liability trial, 496 F.Supp. 597 (D.Mont. 1980), the district court found that the negligence of Air Force personnel in violating Montana statutes and military regulations with respect to the legal closing time for a retail liquor establishment was the proximate cause of Johnson's injuries, and that the negligence of the driver Hay in operating an automobile under the influence of alcohol was a foreseeable intervening cause. The court further found that Johnson had assumed the risk of injuries when he agreed to ride in the automobile driven by Sergeant Hay. The court assigned fault under Montana's comparative negligence statute as follows: Johnson 25%, Hay 40%, the United States 35%. Because Hay had been dismissed with prejudice, damages could not be apportioned against him; consequently, the United States was liable for 75% of the damages. The court dismissed Clara Johnson's loss of consortium claim for lack of subject matter jurisdiction because she failed to satisfy the prerequisite to suit under the FTCA by either joining in her husband's SF–95 claim or filing a separate claim against the United States.

At the trial on the issue of damages, 510 F.Supp. 1039 (D.Mont.1981), the district court found that Freddie Johnson was entitled to recover damages totalling $3,766,-695.69. That figure was reduced by Veterans Administration benefits, past and future, in the amount of $1,466,368. The court then applied the 25% reduction attributable to Johnson's comparative negligence and entered judgment in favor of Johnson in the amount of $1,725,245.76. Although the court found that Johnson required 24-hour home nursing care, it determined that 12-hour care was reasonable, and calculated damages for nursing care based on 12 hours per day.

At the close of trial, Johnson's counsel moved to amend the prayer for damages to $10,000,000 pursuant to Rule 15(b). Because the damage award was less than the $3,500,000 set forth on Johnson's adminis-

trative claim, the court found it unnecessary to rule on plaintiff's motion.

The government makes two arguments on this appeal. First, the government contends that the district court had no jurisdiction to hear plaintiff's claim because his injury was incident to military service. Second, the government argues that the district court improperly computed damages by deducting Veterans Administration benefits from the total damage award before the 25 percent comparative negligence reduction was calculated. Johnson cross-appealed and argues that the district court made four errors. First, the court should not have dismissed Clara Johnson's claim for loss of consortium. Second, the district court should have awarded full-time nursing care instead of 12-hour care. Third, Johnson contends that the court erred in refusing to allow the prayer for damages to be amended after trial. Finally, Johnson claims that the district court's damage awards for pain and suffering and for loss of capacity to pursue an established course of life are so low as to be clearly erroneous.

## I. THE FEDERAL TORT CLAIMS ACT

### A. *Development of the Feres Doctrine*

Through the passage of the Federal Tort Claims Act in 1946, the United States waived its sovereign immunity and agreed to be subject to suit

> for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b) (1976). The FTCA provides that members of the armed forces are deemed to be employees of the federal government. *Id.* § 2671. Of the FTCA's 12 exceptions, none bars suits by service members against the federal government.[1]

---

1. In fact, only one of the FTCA's exceptions    even relates to the military. 28 U.S.C.

Nonetheless, the question of the liability of the United States to members of its armed forces has vexed courts ever since the FTCA's enactment. The government initially maintained that the FTCA did not permit any suits whatsoever by service members. In *Brooks v. United States,* 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949), however, the Supreme Court squarely rejected this argument and held that two servicemen could recover under the Act for injuries resulting from the negligent operation of a motor vehicle by an employee of the United States when the accident did not occur incident to the plaintiffs' military service. As the Court held,

> we are dealing with an accident which had nothing to do with the Brooks' army careers, injuries not caused by their service except in the sense that all human events depend upon what has already transpired. Were the accident incident to the Brooks' service, a wholly different case would be presented.

*Id.* at 52, 69 S.Ct. at 920.

■ *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), presented the Supreme Court with such a "wholly different" case. *Feres* involved three separate causes of action: two for medical malpractice by military doctors and one for maintenance of unsafe barracks. The Supreme Court found that none of these claims was sufficient to establish a cause of action under the FTCA. The Court held that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." *Id.* at 146, 71 S.Ct. at 159.[2]

In defense of its judicially-created "incident to service" exception to the FTCA, the *Feres* Court offered three basic rationales. As the Supreme Court summarized in its most recent discussion of *Feres,* the "inci-dent to service" test is predicated on the "distinctly federal" relationship between the United States and its service personnel, on the presence of an alternative military compensation system, and on the fear of damaging the military disciplinary structure. *See generally Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 671–72, 97 S.Ct. 2054, 2057–58, 52 L.Ed.2d 665 (1977). *See also Davis v. United States,* 667 F.2d 822, 825 (9th Cir.1982); *Lewis v. United States,* 663 F.2d 889, 890 (9th Cir. 1981); *Hunt v. United States,* 636 F.2d 580, 597 (D.C.Cir.1980).

Decisions subsequent to *Feres* have substantially weakened the persuasive force of the first two rationales. The argument that the military relationship is distinctly federal applies with equal force to other federal agencies that are liable under the FTCA. *See, e.g., Jaffee v. United States,* 663 F.2d 1226, 1233 n. 7 (3d Cir.1981) (*en banc*), *cert. denied* 456 U.S. 972, 102 S.Ct. 2234, 72 L.Ed.2d 845 (1982). The second rationale—the existence of an alternative compensation system—has also been applied inconsistently by the Supreme Court. Although the Court mentioned this argument in *Stencel* and *Feres,* it has rejected it in other equally appropriate cases. *See, e.g., United States v. Brown,* 348 U.S. 110, 113, 75 S.Ct. 141, 143, 99 L.Ed. 139 (1954); *Brooks v. United States,* 337 U.S. at 53, 69 S.Ct. at 920. In short, we agree that "given the Supreme Court's inconsistent treatment of this factor, it cannot be said that the presence of an alternative compensation system either explains or justifies the *Feres* doctrine; it only makes the effect of the doctrine more palatable." *Hunt v. United States,* 636 F.2d at 598. *See also Parker v. United States,* 611 F.2d 1007, 1011 (5th Cir. 1980); *Healy v. United States,* 192 F.Supp. 325, 328 n. 13 (S.D.N.Y.), *aff'd,* 295 F.2d 958 (2d Cir.1961).

§ 2680(j) (1976) exempts the federal government from liability on any claim arising out of the combat activities of our military forces in time of war.

2. When the *Feres* doctrine bars a suit, the federal courts must dismiss the case because the United States has not waived its sovereign immunity. *See, e.g., Broudy v. United States,* 661 F.2d 125, 127–28 (9th Cir.1981); *Stanley v. Central Intelligence Agency,* 639 F.2d 1146, 1157 (5th Cir.1981).

In sum, the most persuasive justification for the *Feres* doctrine is the potential impact of civil suits on military discipline. After reviewing the *Feres* doctrine, the Supreme Court concluded that the incident to service exception is "best explained" by the disciplinary rationale. *United States v. Muniz,* 374 U.S. 150, 159–62, 83 S.Ct. 1850, 1856–57, 10 L.Ed.2d 805 (1958). As the Court has noted,

> the peculiar and special relationship of the soldier to his superiors, the effects of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the Torts Claims Act were allowed for negligent orders given or negligent acts committed in the course of military duty, led the Court to read the act as excluding claims of that character.

*United States v. Brown,* 348 U.S. at 112, 75 S.Ct. at 145. *See also Hunt v. United States,* 636 F.2d at 599 ("the protection of military discipline ... serves largely if not exclusively as the predicate for the *Feres* doctrine ... Only this factor can truly explain the *Feres* doctrine and the crucial line it draws ...."); *Parker v. United States,* 611 F.2d at 1010; *Veillette v. United States,* 615 F.2d 505, 506 (9th Cir.1980).

■ Thus, the necessity of safeguarding military discipline provides the most fundamental rationale for limiting recovery under the FTCA to injuries that are not incident to military service. Unfortunately, many courts in applying *Feres* have clouded the incident to service distinction with a myriad of confusing interpretations. In light of such inconsistent case law, our task is to define the "incident to service" test in a way that both satisfies the underlying rationale of the *Feres* doctrine and harmonizes existing case law.

### B. The Applicability of Feres to Plaintiff's Cause of Action

Although decisions interpreting *Feres* have reached widely varying results, it is possible to isolate four factors that most courts have considered important. Although the factors are conceptually different, each bears on what is in our view the most important line of inquiry: the nature of the plaintiff's activities at the time of the government's tortious action. While rigid rules derived from these four factors may sometimes be relevant, they cannot be blindly applied to determine whether an injury occurred "in the course of activity incident to service." *Feres v. United States,* 340 U.S. at 146, 71 S.Ct. at 159. The only way to decide whether an injury is incident to service is to consider the facts of each individual case. Here the facts are not in dispute. We must determine whether plaintiff's admitted activities at the time of the negligence are of the sort that would directly implicate the interests that the *Feres* doctrine was designed to protect. *See, e.g., Woodside v. United States,* 606 F.2d 134, 141 (6th Cir.1979) ("whether a service member is engaged in an activity incident to service is a question of fact ... to be determined from the circumstances of each case."); *Schwager v. United States,* 279 F.Supp. 262, 263 (E.D.Pa.1968). The facts of this case, viewed in light of the *Feres* doctrine's underlying disciplinary rationale, lead us to conclude that the FTCA does permit Johnson's cause of action.

### 1. Place Where the Negligent Act Occurred

■ The location of the negligent act is undoubtedly an important indicator of the status of the injured service member. *See generally Monaco v. United States,* 661 F.2d 129, 132–33 (9th Cir.1981) ("the proper focus in applying the *Feres* doctrine is not the time of injury, but the time of the negligent act."), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982); *Veillette v. United States,* 615 F.2d at 507.

Here the place on the base where the negligent act was found by the trial court to have occurred must be distinguished from the place where the accident occurred. Some courts have held that the situs of the negligence is dispositive: if a member of the armed forces is injured by a negligent act occurring on base, *Feres* is automatically triggered and recovery is barred. *See* discussion in *Troglia v. United States,* 602

F.2d 1334, 1337 (9th Cir.1979). We reject this myopic view of the on-base/off-base distinction. Such an absolute position is often merely a "substitute for analysis of whether the serviceman was injured in an activity incident to his service in the military," *Troglia v. United States,* 602 F.2d at 1338. Moreover, the absolute view emphasizes the location of the negligence to the exclusion of other more important factors.

■ The better view is that the occurrence of government negligence on a military base should not automatically bar recovery. Even when the negligence occurred on-base, the court is obligated to explore the nature of the "function the soldier was performing at the time of the injury in order to ascertain the totality of the circumstances." *Parker v. United States,* 611 F.2d 1007, 1014 (5th Cir.1980). *See also Stanley v. Central Intelligence Agency,* 639 F.2d 1146, 1151 (5th Cir.1981) (situs of negligence "alone is not dispositive;" courts "must consider the totality of the circumstances surrounding the injury"); *Avasthi v. United States,* 608 F.2d 1059 (5th Cir.1979) (FECA liability); *Bryson v. United States,* 463 F.Supp. 908, 913–14 (E.D.Pa. 1978). Many courts have permitted military personnel to recover under the FTCA even though the negligent acts occurred on military bases. *See, e.g., Troglia v. United States,* 602 F.2d at 1339 (accident on government-owned road adjacent to military base); *Bryson v. United States,* 463 F.Supp. 908, 914 (E.D.Pa.1978) (serviceman on pass injured on-base can sue under FTCA because the "location of the incident bears no significant causal relationship to the injury"); *Downes v. United States,* 249 F.Supp. 626 (E.D.N.C.1965) (plaintiff on-base but "on a pass pursuing his personal affairs."); *Hand v. United States,* 260 F.Supp. 38, 42 (M.D.Ga.1966) (although accident occurred on-base, relevant question is what plaintiff was doing when injured); *Rich v. United States,* 144 F.Supp. 791, 792 (E.D.Pa.1956) ("The determinative fact in each case is not where the plaintiff was at the time he was injured ... but whether what he was doing at the time was 'in the course of activity incident to service.' ");

*Nowotny v. Turner,* 203 F.Supp. 802 (M.D. N.C.1962)) (*Feres* does not bar suit merely because accident occurred on military base); *Brown v. United States,* 99 F.Supp. 685 (S.D.W.Va.1951) (government liable for injuries occurring in on-base swimming pool to Navy enlisted man on shore leave).

■ Although the negligent act in this case—permitting the NCO Club to remain open in violation of both Montana law and Air Force regulations—occurred on-base, the connection between the situs of the negligence and Johnson's military service is so tenuous that location is not an important factor. *See, e.g., Troglia v. United States,* 602 F.2d at 1339 (because the connection between location of the accident and military service "is so weak," the court must "further inquir[e] into the extent of the connection between the plaintiff's activities and his military service."). Johnson's work as a bartender in the NCO Club had no relevant relationship to his on-base military activities. The location of the NCO Club should not obscure the fact that Johnson was performing a non-military job in what was essentially a civilian context. In short, we insist on distinguishing "between those cases involving activities arising from life on the military reservation, and those in which presence on the base has little to do with the soldier's military service." *Parker v. United States,* 611 F.2d at 1015. *See also Stanley v. Central Intelligence Agency,* 639 F.2d at 1151. When such a distinction is drawn in this case, it becomes clear that recovery cannot be barred merely because the NCO Club was located on a military base.

### 2. Duty Status of the Plaintiff When the Negligent Act Occurred

The duty status of the plaintiff, while not dispositive, is often taken into account when deciding whether an activity is truly incident to service. *See, e.g., Woodside v. United States,* 606 F.2d at 142; *Troglia v. United States,* 602 F.2d at 1339; *Monaco v. United States,* 661 F.2d at 132. Once again, however, the duty status distinction cannot

be mechanically applied to answer the "incident to service" question. On the contrary, Johnson's duty status is relevant only insofar as it bears on the relationship between the activity leading to the injury and his military service.

■■■■ Johnson was undeniably an active member of the Air Force at the time of the accident and thus on active duty status. In and of itself, however, his active duty status is not relevant to our inquiry. Rather, the fact that he "was on active duty merely proves that he was not an inactive reservist or a discharged veteran." *Troglia v. United States,* 602 F.2d at 1339. The important question is whether the service member on active duty status was engaging in an activity that is related in some relevant way to his military duties. In this case, Johnson's off-duty work as a bartender bears no such relevant relationship to the military disciplinary structure that the *Feres* doctrine was meant to safeguard. *See supra* at 1436. On the contrary, Johnson's work was similar to the sort of second job in the civilian sector that any off-duty service member might undertake. In short, he was in the same position that any civilian employee of the NCO Club might have been in at the time of the government's negligence. The fact that Johnson was off-duty for the day is, under the circumstances presented here, sufficient to eliminate any relevant links between his activities and his military service.[3]

### 3. *Benefits Accruing to Plaintiff Because of His Status as a Service Member*

Several courts have held that the *Feres* doctrine bars suits by service members in-jured while engaging in on-base or government-sponsored recreational activities. *See, e.g., Woodside v. United States,* 606 F.2d at 142 (Air Force-sponsored flying club); *Chambers v. United States,* 357 F.2d 224, 229 (8th Cir.1966) (on-base swimming pool used for personal recreation while not on leave or furlough); *Hass v. United States,* 518 F.2d 1138, 1141–42 (4th Cir.1975) (riding horse rented from military riding stable); *Knight v. United States,* 361 F.Supp. 708 (W.D.Tenn.1972), *aff'd,* 480 F.2d 927 (6th Cir.1973) (on-base swimming pool); *Degentesh v. United States,* 230 F.Supp. 763, 765 (N.D.Ill.1964) (riding in Navy bus to official military recreation party). Moreover, active duty service members injured by the medical malpractice of military doctors have usually been barred from suing under the FTCA. *See, e.g., Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950); *Martin v. United States,* 404 F.Supp. 1240 (E.D.Pa.1975); *Harten v. Coons,* 502 F.2d 1363, 1364 (10th Cir.1974), *cert. denied* 420 U.S. 963, 95 S.Ct. 1354, 43 L.Ed.2d 441 (1979); *Peluso v. United States,* 474 F.2d 605, 606 (3d Cir.), *cert. denied,* 414 U.S. 879, 94 S.Ct. 50, 38 L.Ed.2d 124 (1973); *Shults v. United States,* 421 F.2d 170, 172 (5th Cir.1969); *Buer v. United States,* 241 F.2d 3 (7th Cir.1956), *cert. denied,* 353 U.S. 974, 77 S.Ct. 1059, 1 L.Ed.2d 1136 (1957). The one factor that best explains the results in these cases is that the plaintiffs had access to the various recreational and medical benefits only because of their status as military personnel. Consequently, the injuries suffered were incident to service because the plaintiffs would not have been

---

**3.** Because formal passes are no longer necessary for service members not in their regular duty hours, off-duty soldiers not required to report until the next day have the same status as those on a pass. *See generally Parker v. United States,* 611 F.2d at 1013 n. 9, and cases cited therein. Consequently, the result reached here is consistent with those cases holding that soldiers on pass are not acting incident to their military service. *See, e.g., id.* (four day pass); *Bryson v. United States,* 463 F.Supp. 908, 914 (E.D.Pa.1978) (weekend leave or pass); *Downes v. United States,* 249 F.Supp. 626 (E.D. N.C.1965) (pass to return to off-base resi-dence); *Knecht v. United States,* 144 F.Supp. 786, 789 (E.D.Pa.1956), *aff'd,* 242 F.2d 929 (3d Cir.1957) (pass permitting serviceman to be absent from 5:00 p.m. until 8:00 p.m. the following day); *Barnes v. United States,* 103 F.Supp. 51 (W.D.Ky.1952) (pass to return home); *Rich v. United States,* 144 F.Supp. 791 (E.D.Pa.1956) (weekend pass); *Hand v. United States,* 260 F.Supp. 38 (M.D.Ga.1966) (24-hour pass); *Sapp v. United States,* 153 F.Supp. 496 (W.D.La.1957) (pass to return home); *Blond v. United States,* 117 F.Supp. 119 (S.D.N.Y.1953) (pass); *Rosen v. United States,* 126 F.Supp. 13 (E.D.N.Y.1954) (pass).

privileged to take advantage of the benefits but for their military status. *See, e.g., Bryson v. United States,* 463 F.Supp. at 913.

This factor does not preclude recovery in the case at hand. Johnson's employment at the NCO Club during his off-duty hours can hardly be characterized as a privilege or benefit incident to his military service. Unlike the soldiers using military medical facilities or participating in recreational activities sponsored by the military, Johnson held a paying job at the NCO Club. The job is identified with those routinely performed by civilian bartenders. Indeed, Johnson's after-hours employment at the NCO Club cannot logically be distinguished from second jobs held by other off-duty military personnel. *See, e.g., Mills v. Tucker,* 499 F.2d 866 (9th Cir.1974) (Navy petty officer can sue government under FTCA for injuries sustained on military road while returning to base from his off-duty job as a cook). Thus, to characterize Johnson's moonlighting during his off-duty hours as a benefit incident to military service would distort both precedent and the rationale underlying *Feres.*

#### 4. The Nature of Plaintiff's Activities at the Time the Negligent Act Occurred

The fundamental goal of the *Feres* doctrine is to safeguard the military disciplinary structure from disruptive civil suits. *See supra* at 1436. In our view, then, the most relevant line of inquiry is whether or not the service member's activities at the time of injury are of the sort that could harm the disciplinary system if litigated in a civil action.

Courts interpreting *Feres* have identified two distinct ways in which military discipline could be impeded by the possibility of civil suits concerning activities bearing a strong relationship to military affairs. First, military decision-makers subject to civil suit "might not be willing to act as quickly and forcefully as is necessary, especially during battlefield conditions," if their actions could be second-guessed in a civilian court. *Jaffee v. United States,* 663 F.2d at 1232. *See also Stencel Aero Engineering*

*Corp. v. United States,* 431 U.S. at 673, 97 S.Ct. at 2059. Second, encouraging military personnel to question decisions by their superiors might have some effect on the willingness of such personnel to follow orders. *See, e.g., Jaffee v. United States,* 663 F.2d at 1232; *Hunt v. United States,* 636 F.2d at 599. In light of these concerns, we find that the civil litigation of negligence claims such as Johnson's could not possibly have any effect whatsoever on military discipline. We reach this conclusion for three reasons.

First, at the time the government's negligence occurred, Johnson was not subject in any real way to the compulsion of military orders or performing any sort of military mission. *See, e.g., Parker v. United States,* 611 F.2d at 1014 (recovery under FTCA allowed because serviceman "was not directly subject to military control; he was not under compulsion of military orders; he was not performing any military mission."); *Bryson v. United States,* 463 F.Supp. at 914 (recovery permissible because serviceman "was not acting under compulsion of orders or duty and he was not on a military mission."); *Knecht v. United States,* 144 F.Supp. 786, 789 (E.D.Pa.1956) (recovery allowed when serviceman's "activities were not controlled by his military status."), *aff'd* 242 F.2d 929 (3d Cir.1957). On the contrary, Johnson stands in exactly the same position as a civilian employee of a privately owned nightclub. In short, Johnson could just as easily "have been injured had [he] never worn a uniform at all." *United States v. Brown,* 348 U.S. at 114, 75 S.Ct. at 144 (Black, J., dissenting).

The fact that Johnson was not under military control easily distinguishes the other cases that have concluded that activities in NCO clubs are incident to military service. In *Mariano v. United States,* 605 F.2d 721 (4th Cir.1979), for example, the plaintiff was employed during his off-duty hours as night manager of a Club. Plaintiff was injured while attempting to break up a fight between two patrons. In holding that the *Feres* doctrine barred plaintiff's suit, the court emphasized that official military

regulations made the night manager responsible for maintaining order in the Club. Thus, the plaintiff in *Mariano* was subject to direct military control and was assigned specific duties as night manager by military regulations. Conversely, Johnson was not subject to any such direct control at the time the negligent act occurred. Indeed, Johnson was injured because the NCO Club remained open in clear violation of Air Force regulations and state law. *See also Richardson v. United States,* 226 F.Supp. 49, 50 (E.D.Va.1964) (NCO Club rules provide that any service member may be called on to enforce the rules of the Club).

Second, at the time of the government's negligence, Johnson was subject to military discipline only in the very remotest sense. Because Johnson was off-duty and working at a non-military second job, his activities were "purely personal." *Troglia v. United States,* 602 F.2d at 1340. *See also Parker v. United States,* 611 F.2d at 1013 (even though the accident occurred on-base, "a suit by one leaving the base to attend to his personal affairs, while under no military supervision, will not interfere with military discipline."); *Knecht v. United States,* 144 F.Supp. at 789 (because serviceman was on a pass, "his time was his own and his activities were not controlled by his military status."). In fact, Johnson's status at the time of the negligence was quite similar to that of the serviceman in *Mills v. Tucker,* 499 F.2d 866 (9th Cir.1974). There, a Navy petty officer had a second job during his off-duty hours as a cook at an off-base restaurant. After finishing his day's work as a cook, the serviceman was on his way back to his on-base quarters to attend his son's birthday party when he was involved in a fatal accident. The accident occurred

on a road maintained by the military adjacent to the base. Under these circumstances, we held that the serviceman could sue under the FTCA because at the time of the negligence he was "only in the remotest sense subject to military discipline." *Id.* at 867. Because Johnson's activities were no more closely controlled by the military disciplinary structure, a civil suit should also be permitted in this case.

Third, Johnson's activities do not involve the sort of close military judgment calls that the *Feres* doctrine was designed to insulate from judicial review. *See supra* at 1439. We are not dealing with a case where the government's negligence occurred because of a decision requiring military expertise or judgment. Rather, the government is negligent precisely because it failed to follow established military rules and procedures governing the operation of its NCO Club.[4] A civilian patron of the Club could certainly recover for such negligence.[5] Because there is simply no connection between off-duty work as a bartender and the kind of military interests that the Supreme Court intended to protect in *Feres,* Johnson too should be allowed to recover.

In sum, where there is no relevant relationship between the service member's behavior and the military interests that might be jeopardized by civil suits, the *Feres* doctrine cannot bar recovery. *See, e.g., Woodside v. United States,* 606 F.2d at 141, 142 ("*Feres* requires that there be some proximate relationship between the service member's activities and the Armed Forces.... [W]here the soldier demonstrates that the activity has no significant link to the Armed Forces and is remote to his military

---

4. Indeed, the district court found that the after-hours party "was not an isolated incident, but rather an event of a kind that occurred several times at the NCO Club in violation of express written Club rules." 496 F.Supp. at 600.

5. The district court found that because the NCO Club should have been closed after 2:00 a.m., Johnson—as a noncommissioned Air Force officer—was technically a customer of the Club after that time. 496 F.Supp. at 599. In this regard, *Deeds v. United States,* 306

F.Supp. 348 (D.Mont.1969), is illustrative. *Deeds* involved an Air Force NCO Club at which a minor soldier was served liquor in violation of both state law and military regulations. The intoxicated minor then proceeded to drive a civilian minor female home from the club. An accident occurred off-base in which the female was injured. The civilian female sued and was permitted to recover for the government's negligence in serving liquor to a minor.

service, suit under the Act has been allowed."); *Camassar v. United States,* 400 F.Supp. 894, 897 (D.Conn.1975) ("the more realistically critical test of whether" *Feres* should apply "is the existence or absence of meaningful causal connection between the injury occurrence and the injured person's military service.") *aff'd,* 531 F.2d 1149 (2d Cir.1976); *Schwager v. United States,* 279 F.Supp. 262, 263 (E.D.Pa.1968) (application of *Feres* depends on the "relevant links" between the military and the service member's activity and requires "a measuring of the degree to which the activity is divorced from or related to military service."); *Downes v. United States,* 249 F.Supp. at 628 (*Feres* should only be applied when the service member is "performing duties of such a character" so that a civil suit would "undermine the traditional concepts of military discipline.").

## II. COMPUTATION OF DAMAGES

The trial court awarded Johnson damages of $3,766,655.69. The court then subtracted Johnson's past and future Veterans Act benefits from the total damage award. Once this computation was made, the court reduced the remaining damage award by 25% to account for Johnson's comparative negligence. On appeal, the government argues that the Veterans Act benefits should have been deducted after the total damage award was reduced by 25%.

It is well settled that recoveries by military personnel "under the Tort Claims Act should be reduced by the amounts paid by the United States as disability payments under the Veterans Act." *United States v. Brown,* 348 U.S. 110, 111 n. *, 75 S.Ct. 141, 143 n. *, 99 L.Ed. 139 (1954). *See also Brooks v. United States,* 337 U.S. at 53–54, 69 S.Ct. at 921; *Troglia v. United States,* 602 F.2d at 1337. How such benefits should be deducted under a comparative negligence statute, however, is a question of first impression before this court.

■ The trial court subtracted the Veterans Act benefits from the total amount of damages to which it found Johnson to be entitled, but before making the 25% deduction for Johnson's comparative negligence. Neither party calls our attention to any authoritative precedent dealing with the manner of making this deduction. Logic dictates, however, that we first reduce the total damages by the percentage of fault attributable to Johnson, and then subtract Veterans Act benefits from the remainder. Since Johnson was found to be 25% negligent, he bears the responsibility for 25% of his injuries. It follows that Johnson's total recovery should be limited to 75% of his total damages. By the district court's calculation, the government is held financially responsible for approximately 85% of Johnson's damages, leaving Johnson financially responsible for only 15%.[6] To conform Johnson's financial responsibility for his injuries to his comparative fault, the district court on remand should first reduce total damages by the percentage of Johnson's comparative negligence, then subtract Veterans Act benefits from the remainder to determine the total award. The government then will be financially responsible for only 75% of Johnson's total damages.

## III. AMOUNT OF DAMAGES

■ The trial court awarded Johnson $50,000 in damages for pain and suffering and $50,000 for the destruction of Johnson's capacity to pursue an established course of life. On appeal, Johnson contends that these damage awards are too small and should be revised.

A district court's assessment of damages may not be overturned on appeal unless "we have a definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). *See also United States v. Sumitomo Marine & Fire Insurance Co.,* 617 F.2d 1365, 1369 (9th Cir.1980). In light of the total

---

**6.** The district court determined Johnson's total damages to be $3,766,695.69. The government was held responsible for $3,191,613.76 of that total. (The award of $1,725,245.76 plus Veterans Act benefits of $1,466,368.00). Thus, the court held Johnson responsible for $575,081.93 or 15% of his total damages.

amount of damages awarded to Johnson and the district court's careful treatment of the entire damage issue, we are unable to conclude that the awards at issue here should be overturned.

## IV. LOSS OF CONSORTIUM

■ Exhaustion of the claims procedures established under the Act is a prerequisite to district court jurisdiction. *See, e.g., Johns-Manville Sales Corp. v. United States,* 690 F.2d 721 at 722 (9th Cir.1982); *Blain v. United States,* 552 F.2d 289, 291 (9th Cir.1977) (*per curiam*); *Best Bearings Co. v. United States,* 463 F.2d 1177, 1179 (7th Cir.1972).

■ The district court dismissed Clara Johnson's claim for loss of consortium because she failed to exhaust the FTCA's procedures. Only Freddie Johnson filed a Standard Form–95 claim against the United States. Although Clara Johnson was identified on the claim as Freddie's spouse, there was no mention of a claim for loss of consortium. In addition, she did not sign the form as a claimant. The primary goal of the procedures established by the FTCA is to facilitate satisfactory administrative settlements. Clara Johnson's failure to file a claim for loss of consortium precluded the possibility of any such settlement. *See, e.g., Heaton v. United States,* 383 F.Supp. 589, 591 (S.D.N.Y.1974) (mere appearance of claimant's wife's name on SF–95 form "could not have put the government on notice that she was claiming loss of consortium and services.[7]").

## V. NURSING CARE

Although the trial judge found that Johnson's injuries required 24-hour home nursing care, he calculated damages based on 12-hour care. 510 F.Supp. at 1045. The court reasoned that Johnson's wife could provide care for the remaining 12 hours of every day.

■ Even though the award of damages is within the sound discretion of the district court, *see supra* at 1441–1442, we are compelled to order damages based on 24-hour home nursing care. There is no evidence in the record to support the trial court's award of only 12-hour care. On the contrary, undisputed medical testimony proves that Johnson will require 24-hour professional care for the remainder of his life. Although Johnson's wife might theoretically be able to provide such care for 12 hours per day, uncontradicted trial testimony indicates that such an imposition would seriously threaten the Johnsons' marriage. In short, Clara Johnson should not be obligated to provide her husband with 12 hours of nursing care each day for as long as he lives. The trial court's damages should thus be modified to reflect the cost of 24-hour professional nursing care. We do not mean to state, however, that the item for professional nursing care must be simply doubled by the trial court because the trial court divided the nursing services to be provided under its order between a licensed practical nurse and a "home health aide" to constitute the 12-hour nursing which the court found would suffice. It is, of course, open to the trial court to reassess the 24-hour needs within the requirements for a licensed practical nurse and a home health aide upon remand.

## VI. AMENDED PRAYER FOR RELIEF

At the conclusion of the trial, Johnson moved to amend his prayer for relief to $10,000,000. The government argued that any such amendment should be limited to the $3,500,000 listed on Johnson's FTCA administrative claim. Because the total damages awarded were less than $3,500,000, the trial court found it unnecessary to rule on this issue. 510 F.Supp. 1046. We do not undertake to recompute the amount of damages to be awarded in light of our decision here, because one element of damages remain to be redetermined by the trial court. We, therefore, leave open the ques-

---

7. Johnson cites several decisions that waived the FTCA's administrative requirements. In each of these cases, however, the parties who had failed to file claims were minor children who could obviously not be held accountable for their failure. *See, e.g., Heaton v. United States,* 383 F.Supp. at 591 and cases cited therein.

tion whether the trial court may permit the sought amendment if the recovery should exceed the amount of $3,500,000.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.