**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AARON SCHOENFELD,
          *Plaintiff-Appellant,*

          v.

ERIK QUAMME,

                    *Defendant,*

          and

UNITED STATES OF AMERICA,
          *Defendant-Appellee.*

No. 05-55126

D.C. No.
CV-02-00819-WQH

OPINION

Appeal from the United States District Court
for the Southern District of California
William Q. Hayes, District Judge, Presiding

Argued and Submitted
March 8, 2007—Pasadena, California

Filed July 2, 2007

Before: Pamela Ann Rymer, Kim McLane Wardlaw, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Wardlaw

7807

## COUNSEL

Thomas F. Friedberg, Law Offices of Friedberg & Bunge, San Diego, California, for the plaintiff-appellant.

Peter D. Keisler, Assistant Attorney General, Carol C. Lam, United States Attorney, Robert S. Greenspan, Attorney, and Lowell V. Sturgill, Jr., Attorney (argued), for the defendant-appellee.

## OPINION

WARDLAW, Circuit Judge:

Lance Corporal Aaron Schoenfeld lost his leg while a passenger in his roommate's car when it crashed into a previously damaged, but unrepaired, guardrail on a military base. The sole issue on appeal is whether the *Feres* doctrine, which immunizes the government from suit for injuries arising incident to military service, bars Schoenfeld's claim against the government under the Federal Tort Claims Act ("FTCA"). The district court determined that the *Feres* doctrine bars Schoenfeld's action and dismissed it for lack of subject matter jurisdiction. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we reverse and remand for further proceedings.

## I.

Aaron Schoenfeld was a Lance Corporal in the United States Marine Corps stationed at Marine Corps Base, Camp Pendleton in Southern California. He was generally on duty from Monday to Friday and had weekends off. On Friday, July 13th, 2001, Schoenfeld finished up work in the afternoon and began his weekend liberty. "Liberty" is a short period during which servicemen are permitted to leave the base at will. They are not required to seek permission in their comings and goings, or to report on their whereabouts. Liberty status is subject to immediate cancellation. Soldiers on liberty are still subject to the Uniform Code of Military Justice, 10 U.S.C. §§ 801 *et seq.*, and to Camp Pendleton's rules and regulations. Schoenfeld was not due to report back to service until the following Monday.

On Saturday morning, Schoenfeld and his roommate, co-defendant Erik Quamme, also a marine, decided to head off-base for the day and drive to Oceanside, a town abutting Camp Pendleton. According to Schoenfeld, their plan was "to mail some letters, have lunch, see a movie and 'hang out' for

the afternoon." Before heading out, Schoenfeld tossed his dirty laundry into the back of the car, figuring he would have it washed at a cleaners in Oceanside. Among the dirty clothes were some of his military uniforms.[1] The pair took Quamme's car, with Quamme driving and Schoenfeld sitting in the passenger seat. Driving on Stuart Mesa Road, Quamme lost control of the car and crashed into a guardrail that had been badly damaged in a prior accident.[2] The collision severed Schoenfeld's right leg below the knee.

Stuart Mesa Road is located within Camp Pendleton, a limited access federal military facility. All entrances to the base feature sentries and security gates. The base's roads and entry gates are under the authority of Camp Pendleton's commanding general. Access to Camp Pendleton is restricted, but base regulations permit limited access to the public. Civilians are allowed on base between 8 a.m. and sunset every day, but they must first enter their names into the base's Visitor Control Log. Civilian travel within the base is restricted to hard surface roads, including Stuart Mesa Road.

The Provost Marshal, a military officer, is responsible for road maintenance in Camp Pendleton. However, civilian employees play a substantial role in managing the day-to-day maintenance and repair of the base's roads even though those tasks are under the ultimate authority of military officers.

---

[1]In his declaration to the district court, Major J.A. Lore testified that marines have a duty to keep their uniforms "properly configured, clean and presentable." This responsibility is "very significant . . . , as the appearance of a Marine's uniform reflects on his personal discipline and his pride in the Marine Corps." Schoenfeld did not have to wash his uniforms off-base, however, and he was not acting on specific orders when he threw them into the car. Instead, his usual routine was to wash his uniforms himself, or to have them taken care of at Camp Pendleton's own laundry.

[2]Two months earlier, co-defendant Byron Jacobson had crashed into the guard rail. Camp Pendleton's maintenance staff had begun repairs, but a jagged edge still protruded into oncoming traffic.

Passengers in cars driving through Camp Pendleton are subject to Section 2404 of the base regulations. This section mandates, among other things, that passengers wear seatbelts, stay inside the vehicle while it is running, and ride in a manner such that no part of their body, clothing, or personal items protrude from the car.

Following his injury, the government has paid for a significant portion of Schoenfeld's medical bills and also provided free on-site air evacuation, emergency care, and follow-up medical treatment. Schoenfeld is entitled to affordable healthcare and pharmacy services through the military's TRICARE program. However, Schoenfeld claims that he has not been reimbursed for several surgeries and that he was forced to purchase his own medical insurance. Additionally, the government has represented to Schoenfeld that any medical expenses paid for under any insurance, including Medicare and TRICARE, will only be paid subject to a third party reimbursement agreement mandating that any benefits paid must be reimbursed from the proceeds of this action.

After the accident, Schoenfeld continued to receive his regular military salary until 2002, when he was placed on the Navy's Temporary Disability Retirement List, which entitles him to a portion of his military pay. Schoenfeld receives disability benefits from the Department of Veterans Affairs totaling $1,111.00 per month. He is also eligible for subsistence payments of $464 per month while attending college and a $9,000 car allowance.

In April 2002, Schoenfeld filed a complaint in the district court against co-defendants Quamme and Jacobson. He subsequently filed an amended complaint, adding a FTCA claim against the United States alleging that the government had knowledge of the damaged guardrail and negligently failed to repair or warn of the dangerous condition. Quamme and Jacobson eventually settled with Schoenfeld and were dismissed from the case. On June 18, 2003, the government

moved to dismiss the complaint for lack of subject matter jurisdiction under *Feres v. United States*, 340 U.S. 135 (1950), or in the alternative for summary judgment. In a reasoned order dated August 5, 2003, Judge Judith Keep declined to find the *Feres* doctrine applicable, following our opinion in *Dreier v. United States*, 106 F.3d 844 (9th Cir. 1996). On September 14, 2004,[3] the action was reassigned to Judge Hayes. The government again filed a motion to dismiss under *Feres*, and this time it was granted. Schoenfeld timely appealed.

## II.

We have jurisdiction over final judgments of the district court under 28 U.S.C. § 1291. "Whether the *Feres* doctrine applies to the facts in the record is reviewed de novo. Factual findings are reviewed de novo, with all disputed facts resolved in favor of the non-moving party." *Costo v. United States*, 248 F.3d 863, 865-66 (9th Cir. 2001) (citations omitted).

## III.

**[1]** The FTCA is a broad waiver of the federal government's sovereign immunity: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . ." 28 U.S.C. § 2674; *see also* 28 U.S.C. §§ 1346(b)(1), 2679. In *Feres*, the Supreme Court carved out a significant exception, holding that "the Government is not liable under the [FTCA] for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service." 340 U.S. at 146. "This broad exception has been labeled 'the *Feres* doctrine.' " *Costo*, 248 F.3d at 866.

---

[3]Sadly, Judge Keep lost her final battle with cancer on that date.

The *Feres* doctrine is rooted in three policy rationales: (1) the need for a uniform system of compensation for soldiers spread out across the country and the world; (2) the Veterans' Benefits Act ("VBA") provides soldiers with a generous alternative to recovery in tort; and (3) allowing soldiers to file lawsuits against the armed forces undermines military discipline. *See McConnell v. United States*, 478 F.3d 1092, 1095 (9th Cir. 2007) (citing *Costo*, 248 F.3d at 866). We have recognized that the third rationale — the interest in maintaining military discipline — is "the most persuasive justification" for the doctrine, and our *Feres* cases have focused mainly on whether the serviceman's activities implicate that interest. *Dreier*, 106 F.3d at 849 (quoting *Johnson v. United States*, 704 F.2d 1431, 1436 (9th Cir. 1983)); *see also United States v. Millang*, 817 F.2d 533, 535 (9th Cir. 1987) (per curiam) (noting that the "key inquiry is 'whether the suit requires the civilian court to second-guess military decisions, . . . and whether the suit might impair essential military discipline.' ") (quoting *United States v. Shearer*, 473 U.S. 52, 57 (1985)).

**[2]** We have identified four non-exclusive factors relevant to determining whether *Feres* bars an action ("the *Johnson* Factors"):

1) the place where the negligent act occurred;

2) the plaintiff's duty status when the negligent act occurred;

3) the benefits accruing to the plaintiff because of his status as a service member; and

4) the nature of the plaintiff's activities at the time of the negligent act.

*Bon v. United States*, 802 F.2d 1092, 1094 (9th Cir. 1986) (citing *Johnson*, 704 F.2d at 1436-41). None of these factors

is dispositive; instead, we look to the totality of the circumstances. *Costo*, 248 F.3d at 867.

## IV.

Despite this framework, our *Feres* jurisprudence is something of a muddle. "[W]e have reached the unhappy conclusion that the cases applying the *Feres* doctrine are irreconcilable, and thus, comparison of fact patterns to outcomes in cases that have applied the *Feres* doctrine is the most appropriate way to resolve *Feres* doctrine cases." *Id.* (internal quotation marks omitted). Therefore, we now examine "the Ninth Circuit cases that are most factually analogous to the case at bar to determine whether the *Feres* doctrine bars [Schoenfeld's] suit." *Dreier*, 106 F.3d at 849.

In *Johnson*, an active duty Air Force sergeant moonlighted as a bartender in the Noncommissioned Officers Club ("NCO Club") located on Malmstrom Air Force base in Montana. 704 F.2d at 1433. After the NCO Club closed at 2:00 a.m. in compliance with Montana law and military regulations one night, Johnson and several other employees held a liquor-laden after-hours party until 4:30 a.m. *Id.* Another employee, Hay, who was intoxicated, agreed to drive Johnson to his off-base home. *Id.* About a mile outside the entrance to the base, Hay's vehicle was involved in an accident which resulted in Johnson becoming a quadriplegic. *Id.* Johnson was an active duty officer at the time of the accident, but he was off-duty for that day. *Id.* at 1438. The government denied Johnson's administrative claim. He brought suit under the FTCA alleging that the government negligently allowed the NCO Club to stay open late in violation of Montana and military law.

We held that *Feres* was inapplicable, noting that "the most persuasive [policy] justification for the *Feres* doctrine is the potential impact of civil suits on military discipline," and that while the NCO Club's on-base location weighed in favor of a *Feres* bar, the "occurrence of government negligence on a

military base should not automatically bar recovery." *Id.* at 1436-37.

Instead of focusing narrowly on where the NCO Club was located, we considered the connection between "the situs of the negligence and Johnson's military service . . . ." *Id.* at 1437. We found that connection "tenuous," because Johnson was essentially acting in a civilian capacity while working at the NCO Club. *Id.* ("The location of the NCO Club should not obscure the fact that Johnson was performing a non-military job in what was essentially a civilian context.").

With respect to the second *Johnson* factor — the service-man's duty status — we gave little weight to Johnson's active duty status because he was off-duty at the time of the negligent act. *Id.* at 1438 ("In and of itself, however, his active duty status is not relevant to our inquiry."). Noting that "[t]he important question is whether the service member on active duty status was engaging in an activity that is related in some relevant way to his military duties," we concluded that "Johnson's off-duty work as a bartender bears no such relevant relationship to the military disciplinary structure that the *Feres* doctrine was meant to safeguard." *Id.*

In particular, we emphasized that Johnson was acting in a manner that did not meaningfully distinguish him from a civilian: "In short, he was in the same position that any civilian employee of the NCO Club might have been in at the time of the government's negligence." *Id.* Therefore, we held that "[t]he fact that Johnson was off-duty for the day is, under the circumstances presented here, sufficient to eliminate any relevant links between his activities and his military service." *Id.*

With respect to the third factor — benefits accruing to the plaintiff because of his status as a service member — we drew a clear line between cases where the "plaintiffs had access to the [activity in question] only because of their status as military personnel," and those where civilians might also have

access. *Id*. at 1438-39 (noting that *Feres* applies in cases where "the plaintiffs would not have been privileged to take advantage of the benefits but for their military status"). We held that Johnson's employment at the NCO Club could not be characterized as a privilege incident to his military service, because it was a second job of the type commonly held by civilians. *Id*. at 1439. *Johnson* thus strongly suggests that NCO Club positions were not actually available to civilians, but rather that the essentially non-military *nature* of the activity weighed against applying *Feres*. *Id*. ("Johnson held a paying job at the NCO Club. The job *is identified* with those routinely performed by civilian bartenders. Indeed, Johnson's after-hours employment at the NCO Club cannot logically be distinguished from second jobs held by other off-duty military personnel.") (emphasis added).

Our discussion of the fourth factor is perhaps the most illuminating and important to our decision here. In considering the nature of the Johnson's activities, we held that "the most relevant line of inquiry is whether or not the service member's activities at the time of the injury are of the sort that could harm the disciplinary system if litigated in a civil action." *Id*. We concluded that Johnson's activities could not have adversely affected military discipline for three reasons. First, he was "not subject in any real way to the compulsion of military orders or performing any sort of military mission . . . . [He] could just as easily 'have been injured had [he] never worn a uniform at all.' " *Id*. (quoting *United States v. Brown*, 348 U.S. 110, 114 (1954) (Black, J., dissenting)). Second, we noted the "purely personal" nature of Johnson's activity, which is noteworthy given that he was working in a military-controlled bar. *Id*. at 1440 (quotation marks omitted). Lastly, we emphasized that Johnson's employment at the NCO Club did "not involve the sort of close military judgment calls that the *Feres* doctrine was designed to insulate from judicial review." *Id*.

*Dreier* is another factually analogous case relied upon by Schoenfeld. Ronald Dreier was on liberty for an afternoon, spent the day drinking beer and hanging out on a beach located on Fort Lewis, Washington, and died after falling into a steep wastewater drainage channel. 106 F.3d at 845-46. The beach was a restricted access area and civilians could enter only with a use permit.[4] *Id*. Dreier's widow sued under the FTCA, alleging the government knew that the area was hazardous but did nothing to make it more safe. We reversed the district court's ruling that *Feres* barred her suit. We reasoned that because civilians could gain access to the beach, Dreier's presence there made his activities "indistinguishable" from a civilian and weighed against applying *Feres*. *Id*. at 853. Like Johnson's bartending job, Dreier's "ability to use [the beach area could] 'hardly be characterized as a privilege or benefit incident to his military service.' " *Id*. (quoting *Johnson*, 704 F.2d at 1439). Although the fact that Dreier was off-duty only for the afternoon "weigh[ed] slightly in favor of a *Feres* bar," we held that fact was not determinative. *Id*.

In *Dreier* the government argued, as it does here, that because Dreier was subject at the time to various military regulations and also to immediate cancellation of his liberty, civil litigation could undermine discipline. *Id*. We firmly rejected those arguments, noting that the "government's rationale . . . would bar recovery against the government by any soldier injured on military property, an absolutist position rejected by *Johnson*." *Id*. Because Dreier was not acting under military orders or performing a mission, he was, like Johnson, "subject to military discipline only in the very remotest sense." *Id*. (internal quotation marks omitted).

We then observed that "close military judgment call[s]" were not involved when it came to providing adequate warnings about a dangerous drainage channel, and therefore that

---

[4]As a practical matter, however, members of the public often used the beach without first obtaining permits. *Dreier*, 106 F.3d at 846.

military discipline would not suffer if the suit went forward. *Id*. at 853-54 (quoting *Johnson*, 704 F.2d at 1440). We found relevant "that many, if not all of the employees overseeing the [site of the accident] were civilians." *Id*.

In *Bon*, Janice Bon was an active duty member of the United States Navy. 802 F.2d at 1093. She was injured when a government motor boat struck a canoe she was rowing and had rented from the Navy's Special Services facility at the San Diego Naval Training Center. *Id*. Bon was on authorized liberty at the time, though it is unclear for how long. *Id*. Although the parties disputed whether the accident occurred within the military base's boundaries or just outside of them, we held that resolution of that issue would not affect the outcome of the case. *Id*. at 1095 n.3.

We held that *Feres* barred Bon's FTCA action. Among other facts, we noted that Bon's canoe was struck by a motor boat driven by another active duty serviceman and that the accident occurred on or very close to military property. *Id*. at 1095. We also emphasized that the government offered canoe rentals as a benefit of military service, and that unlike in *Johnson*, only servicemen could take advantage of that benefit. *Id*. Lastly, we analyzed the nature of the activity and found that "its entire scope was subject to military orders and discipline," which weighed heavily on the side of applying *Feres*. *Id*. at 1095-96. We also distinguished *Johnson*, where plaintiff was subject to military discipline "only in the sense that members of the military are at all times subject to the orders of their commanding and superior officers." *Id*. at 1096. The dispositive difference for us was that "Bon was subject to military orders and regulations for the particular activity in which she was engaged." *Id*.

In *Costo*, Nollie Costo, a sailor in the United States Navy, drowned during a Navy-sponsored recreational white water rafting trip. 248 F.3d at 864. While the actual rafting was off-base, *id*. at 868, the trip was part of the Navy's Morale, Wel-

fare, and Recreation program, the "administration, supervision, and operation" of which was the "responsibility of cognizant commanding officers." *Id.* at 865. The key facts were closely analogous to those found in *Bon*: Costo was active duty, but on liberty; the rafting trip was provided as a benefit of service and was open only to servicemen; and the recreational program was under the command of the base's commanding officer. *Id.* at 867. We noted that it was firmly established that "military-sponsored activities fall within the *Feres* doctrine, regardless of whether they are related to military duties." *Id.* at 868. Therefore, relying heavily on *Bon*, we held that *Feres* barred the estate's action. *Id.* at 869; *see also McConnell*, 478 F.3d at 1096-97 (relying on *Costo* and *Bon* to hold that a serviceman's family could not bring suit for government negligence leading to his death during an Air Force-sponsored recreation program).

The government here relies heavily on *Coffey v. United States*, 455 F.2d 1380 (9th Cir. 1972) (per curiam).[5] Coffey, like Schoenfeld, was involved in a car accident at Camp Pendleton. *Coffey v. United States*, 324 F. Supp. 1087, 1087 (S.D. Cal. 1971). He died when a train struck the car in which he was riding as a passenger at an intersection between a government-maintained road and some railroad tracks. *Id.* Significantly, there is no indication that the road on which Coffey was killed was accessible to the general public. Coffey was on liberty at the time. *Id.* The district court assumed for purposes of the motion that the car in which Coffey rode was heading off-base for non-military purposes. *Id.* The district court noted that while he was still within Camp Pendleton, Coffey "was subject to all liberty, cancellation of liberty, uni-

---

[5]Our succinct opinion in *Coffey* states that "[t]he facts of the case may be found in the decision of the district court," but does not adopt the district court's reasoning. The opinion affirms the district court's grant of summary judgment on the conclusory ground that "[i]t is clear that Coffey was acting incident to military service," but fails to provide any reasons for its own decision. 455 F.2d at 1380.

form, traffic and other military regulations." *Id*. The district court concluded that *Feres* barred Coffey's claim, *id*. at 1088, and we affirmed without providing our own reasoning, *Coffey*, 455 F.2d at 1380.

## V.

With these cases in mind, we turn to the factual circumstances before us. We structure our analysis around the four *Johnson* factors and look to the totality of the circumstances, but we note from the outset that it is the fourth factor — the nature of the plaintiff's activities — that our precedent establishes as most relevant in determining whether *Feres* bars Schoenfeld's suit.

### a.    Place Where the Negligent Act Occurred

**[3]** Because the alleged negligence occurred on a military base, the first *Johnson* factor weighs in favor of a *Feres* bar. *See Dreier*, 106 F.3d at 852. However, the situs of the negligence is "not determinative." *Id*. Indeed, where the nature of a plaintiff's activities at the time of injury are only minimally related to his military service, we have declined to give much weight to this factor. *See, e.g.*, *Johnson*, 704 F.2d at 1437 ("[T]he connection between the situs of the negligence and Johnson's military service is so tenuous that location is not an important factor."); *Troglia v. United States*, 602 F.2d 1334, 1339 (9th Cir. 1979) (where there is little connection between the site of the accident and plaintiff's military service, courts must "further inquir[e] into the extent of the connection between the plaintiff's activities and his military service.").

**[4]** In this regard, our precedent indicates that the fourth *Johnson* factor (the nature of the plaintiff's activities when the negligent act occurred) may affect our analysis under the first factor (the situs of the alleged negligence). Because, as discussed below, we conclude that Schoenfeld's act of riding in a car while on liberty heading off-base for the weekend was

substantially unrelated to his military service, we do not attach great weight to the fact that the negligent act occurred on base.

### b. *Schoenfeld's Duty Status When the Negligent Act Occurred*

[5] Schoenfeld, an active duty marine, was on liberty from Friday afternoon until Monday morning. Schoenfeld's active duty status cuts in favor of applying *Feres*, *see Bon*, 802 F.2d at 1095, but not strongly given that he was on liberty at the time. Indeed, because Schoenfeld was not engaged in military activity when he was injured, as discussed below, his duty status is at best marginally relevant to the *Feres* analysis. *See Johnson*, 704 F.2d at 1438 ("In and of itself, however, his active duty status is not relevant to our inquiry . . . . The important question is whether the service member on active duty status was engaging in an activity that is related in some relevant way to his military duties . . . . The fact that Johnson was off-duty for the day is, under the circumstances presented here, sufficient to eliminate any relevant links between his activities and his military service.") (citation omitted).

### c. *Benefits Accruing to Schoenfeld Because of His Status as a Service Member*

[6] Our cases have construed the third factor broadly to encompass "benefits" accruing to a serviceman both before and after he is injured. For example, we have considered as relevant the benefit of being permitted to participate in the activity that led to the injury. *See Bon*, 802 F.2d at 1095. We have also held that compensation received on account of the resulting injury is a "benefit" of military status. *See Jackson v. United States*, 110 F.3d 1484, 1489 (9th Cir. 1997). These are seemingly unrelated inquiries, and were we writing on a clean slate we might say there were five *Johnson* factors instead of four.

But in any event, both of these constructs are implicated here, and they cut in opposite directions. On the one hand, Schoenfeld has received substantial disability benefits from the military, a fact that weighs in favor of applying *Feres*. On the other hand, riding along Stuart Mesa Road, which is partially open to the public, was not a privilege available to him because of his military status.

    i.   *Schoenfeld Received Substantial Disability Benefits*

**[7]** The parties dispute the precise benefits Schoenfeld has received on account of his injuries, but it is clear he has had a significant amount of his medical care paid for; receives monthly disability checks; enjoys cheap healthcare for life; and qualifies for allowances for his car and college education. "The existence and receipt of these medical and disability benefits by [Schoenfeld] supports the application of the *Feres* doctrine in this case." *Jackson*, 110 F.3d at 1489; *see also Dreier*, 106 F.3d at 855 (noting that plaintiff's widow was denied administrative compensation). However, the government has indicated that it will seek an offset for these expenses from any amount Schoenfeld may recover from this suit, and Schoenfeld acknowledges in his briefing that any disability benefits he receives would be deducted from an award of FTCA damages. Moreover, neither *Jackson*, *Dreier*, nor any of our other cases holds that the receipt of disability and medical benefits is a dispositive factor in the *Feres* analysis. A serviceman is not precluded from FTCA recovery merely because he receives disability benefits. *See United States v. Brown*, 348 U.S. 110, 113 (1954) (observing "that Congress had given no indication that it made the right to compensation the veteran's exclusive remedy, [and] that the receipt of disability payments under the Veterans Act was not an election of remedies and did not preclude recovery under the Tort Claims Act but only reduced the amount of any judgment under the latter Act.").

ii. *Driving on the Road Was Not a Benefit of Military Service*

**[8]** Schoenfeld was doing what any member of the public could have done that Saturday morning: riding in a car on Stuart Mesa Road. In *Bon*, we emphasized that Janice Bon was able to rent a canoe only because of her military status. 802 F.2d at 1095 ("[U]se of the [canoes] was restricted to members of the military and employees of the Department of Defense and their guests and dependants."). In *Millang*, plaintiff's suit was *Feres*-barred in part because the picnic where the accident occurred was open only to servicemen and their guests. 817 F.2d at 535 ("Millang enjoyed the use of the picnic area solely by virtue of his status as a serviceman.").

**[9]** The original district court judge correctly reasoned that the factual circumstances of this case are closer to *Johnson* and *Dreier* than to *Bon* and *Millang*. In *Johnson*, we emphasized that Johnson "was in the same position that any civilian employee of the NCO Club might have been in . . . ." 704 F.2d at 1438. Similarly, in *Dreier*, the beach was open to civilians (with a permit) as well as to servicemen. 106 F.3d at 853 (Dreier's "ability to use the [beach] can hardly be characterized as a privilege or benefit incident to his military service.") (internal quotation and citation omitted). In *Bon* and *Millang*, no member of the public could have participated in the plaintiffs' activities, so the benefits were clearly incident to military service. That is not the case here, which weighs against applying a *Feres* bar.

d. *The Nature of Schoenfeld's Activities At the Time the Negligent Act Occurred*

**[10]** Our case law suggests that this factor is the most important in determining whether a plaintiff's suit is *Feres*-barred, and that the key inquiry is "whether or not the service member's activities at the time of injury are of the sort that

could harm the disciplinary system if litigated in a civil action." *Johnson*, 704 F.2d at 1439.

**[11]** Schoenfeld's activities do not implicate military discipline in any meaningful way. He was not subject to "the compulsion of military orders or performing any sort of military mission." *Dreier*, 106 F.3d at 853 (quotation omitted). The military did not require Schoenfeld to drive to Oceanside that day — he could have gone elsewhere off-base, or remained in his barracks until his weekend liberty was over.

The government points to several regulations of general applicability to which Schoenfeld remained subject during his weekend leave, including the rules that he wear a seatbelt in a car; that he abide by certain wardrobe requirements like wearing a belt around his pants; and that he not travel more than a certain distance away from Camp Pendleton. These do not implicate military discipline sufficiently to invoke the *Feres* bar because they involve "aspects of the operation of a military base that are not related to traditional military functions." *Id.* at 854 n.9. And we observe that if we found such rules on their own to be sufficient, no marine on liberty could ever recover under the FTCA; nor could any marine injured in a car accident within Camp Pendleton. Those are precisely the type of "absolutist" positions we rejected in *Dreier*. *Id.* at 853 ("Adopting the government's rationale, however, would bar recovery against the government by any soldier injured on military property.").

**[12]** Moreover, Schoenfeld's activities leading up to his accident are not meaningfully distinguishable from those of a civilian, which suggests a minimal impact on military discipline. This case is unlike *Bon*, *Costo*, or *McConnell*, where the plaintiffs' military status afforded them access to certain privileges. Civilians and servicemen alike could drive on Stuart Mesa Road. *See Johnson*, 704 F.2d at 1438 (noting that "Johnson was in the same position that any civilian employee of the NCO Club might have been in"); *Dreier*, 106 F.3d at

853. That fact distinguishes this case from *Coffey*, where the plaintiff was involved in an accident on "a government-maintained private road." 324 F. Supp. at 1087.

**[13]** We are also unpersuaded by the government's suggestion that Schoenfeld was engaged in military activity because he was taking his uniforms to be laundered. Notwithstanding the general regulations regarding the cleanliness of uniforms, Schoenfeld was not under orders to wash his uniforms at a specific time or place. That he opted to launder them in Oceanside that Saturday does not convert his weekend off into a military mission. And in any event, the record suggests that Schoenfeld was bringing both his military and his civilian clothes to be cleaned. It would be quite arbitrary, and would in no way bolster military discipline, to insist that for a soldier to recover he must sort his laundry not just by colors and whites, but also by work- and plain-clothes.

**[14]** Lastly, it weighs against a *Feres* bar that "many, if not all of the employees directly overseeing [road repair at Camp Pendleton] were civilians." *Dreier*, 106 F.3d at 853. This leads us to doubt that second-guessing the government on that issue will "involve the sort of close military judgment call that the *Feres* doctrine was designed to insulate from judicial review." *Johnson*, 704 F.2d at 1440. In *Dreier*, we emphasized that the type of negligence at issue could just as easily have been alleged against "a completely private water treatment plant." 106 F.3d at 854. Similarly, the neglected damage to the guardrail in this case could just as easily have existed on a non-military road. There was nothing distinctly military about the earlier car crash that created it, nor about the dangerous condition itself. We conclude, therefore, that Schoenfeld's activities leading up to his accident are not of the sort that could adversely impact military discipline if litigated in a civil suit.

## CONCLUSION

**[15]** For the foregoing reasons, we hold that Schoenfeld's claim is not barred by the *Feres* doctrine and that his action against the government may proceed.

**REVERSED and REMANDED.**