95 F.3d 1435
 96 Cal. Daily Op. Serv. 6939, 96 Daily Journal
D.A.R. 11,350
Rebecca R. DREIER, individually and as PR of the Estate;
Ronald E. Dreier, deceased; and as parent and
Guardian; Kaylee E. Dreier, a minor
child, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendants-Appellees.
 No. 95-35601.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 12, 1996.
Decided Sept. 17, 1996.
 
 William J. Carlson and David B. Richardson, Bellevue, WA, for plaintiffs-appellants.
 Philip H. Lynch, Assistant United States Attorney, Seattle, WA, for defendant-appellee.
 Appeal from the United States District Court for the Western District of Washington, Robert J. Bryan, District Judge, Presiding. D.C. No. CV-93-05618-RJB.
 Before: REAVLEY,* REINHARDT, and WIGGINS, Circuit Judges.
 WIGGINS, Circuit Judge:
 
 
 1
 Specialist Ronald E. Dreier (hereinafter "Ronald"), a soldier in the United States Army, was killed when he fell into a steep wastewater drainage channel located on Fort Lewis, Washington, after an off-duty afternoon of relaxation and beer drinking. The district court dismissed his widow's Federal Tort Claims Act ("FTCA") suit against the United States for wrongful death, concluding that the claim was barred by Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), because Ronald's death was incident to his military service. We have jurisdiction pursuant to 28 U.S.C. § 1291 and reverse and remand.
 
 FACTS
 
 2
 Ronald E. Dreier was an Administrative Specialist (Clerk) assigned to the 525th Replacement Detachment, Fort Lewis, Washington. On May 2, 1991, because his unit was scheduled to go into the field the following day, Ronald and his co-workers were released from duty at noon. Sergeant Scott Meir, one of Dreier's co-workers and possibly his office supervisor,[1] informed others in the office that he planned to spend the afternoon at the Solo Point Boat Launch, an area of Fort Lewis adjacent to Puget Sound, to relax, drink some beer, and get some sun. Under base regulations, use of the Solo Point area, consisting of a small beach and boat launch area, is officially limited to members of the military community and civilians who acquire use permits. In practice, the public is often able to gain access to the Solo Point area without acquiring a permit.
 
 
 3
 Ronald drove to his off-base home in Tacoma, changed out of uniform, went shopping, and drove to Solo Point. He was soon joined by Sergeant Meir between 1:30 p.m. and 2:00 p.m. Specialist Rivera and Sergeant Anderson arrived later in the afternoon. The four soldiers sunbathed, drank beer, and waded in the water of Puget Sound. In total, Ronald drank about six to eight beers. After a few hours, the soldiers began walking westward along Burlington Northern Railroad tracks that ran along the shoreline of Puget Sound. After walking for a distance of approximately one half mile, they came upon the Solo Point Water Treatment Facility's concrete drainage channel passing under the tracks and emptying into Puget Sound.
 
 
 4
 The water treatment facility itself is located at the top of a hill rising above the shore of Puget Sound. Water that is directed through the facility is redirected into a concrete channel approximately ten feet wide, with steep fifteen foot walls on either side. The channel runs downhill from the treatment facility at a sixty degree angle for approximately 400 feet, and the water in the channel travels at approximately sixty miles an hour. Concrete baffles at the bottom of the channel slow the water before it enters Puget Sound.
 
 
 5
 On the day of Ronald's death, the immediate area around the drainage channel was overgrown, and there were no signs warning of the danger of the channel or fences immediately around it.[2] At about 5:00 p.m., the group waded in the rocks near where the channel emptied into Puget Sound. The group decided to hike from the mouth of the channel to the top of the hill where the channel began. Ronald lagged behind Anderson, Meir, and Rivera, who all reached the top of the hill. They remained at the top of the hill for approximately twenty minutes before returning to the bottom. There, they found the body of Ronald, who had apparently fallen into or otherwise entered the channel and had been swept into the concrete baffles at the bottom of the channel. Ronald's death was caused by drowning and severe, blunt head and neck injuries. His blood alcohol level at the time of his death was .16 percent.
 
 
 6
 Ronald's widow, Rebecca Dreier (hereinafter "Dreier") filed two claims for administrative settlement with the Department of the Army, requesting a total of $7,000,000. The claims were denied in May 1993. On November 5, 1993, Dreier brought a claim for wrongful death against the United States under the FTCA, 28 U.S.C. §§ 2671 et seq., in the district court for the Western District of Washington, alleging negligence on the part of the government, claiming that the government knew that the area surrounding the treatment facility "was so highly dangerous and ultra-hazardous as to constitute a life-threatening risk to any person who encountered it, yet failed to institute any safety measures intended to prevent injury or death."
 
 
 7
 On March 28, 1995, the government filed, pursuant to Fed.R.Civ.P. 12(b) and 56 a "Motion to Dismiss, or, in the Alternative, for Summary Judgment." The government requested that the district court dismiss Dreier's complaint for lack of subject matter jurisdiction under the Feres doctrine, or in the alternative, that it grant summary judgment pursuant to two Washington state statutes. On May 16, 1995, the district court dismissed Dreier's claims as barred by the Feres doctrine, and did not reach the state law issues.
 
 DISCUSSION
 
 8
 Dreier argues that the district court erred by treating the government's motion to dismiss pursuant to the Feres doctrine as a motion for summary judgment, and that the court erred by concluding that Ronald's injuries were suffered "incident to service" and that the Feres doctrine bars Dreier's claim. The government argues that even if the Feres doctrine does not apply, Dreier's claim is barred by a Washington statute that immunizes from wrongful death suits landowners who allow the public to use their land for recreational purposes, or by a Washington statute that bars wrongful death recovery where the victim was intoxicated at the time of his death and was more than fifty percent at fault for his death.
 
 I. THE FERES DOCTRINE
 A. Procedural Issues and Standard of Review
 
 9
 A motion to dismiss pursuant to the Feres doctrine is properly treated as a Fed.R.Civ.P. 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, rather than as a motion for summary judgment. See, e.g., Atkinson v. United States, 825 F.2d 202, 204 n. 2 (9th Cir.1987), cert. denied, 485 U.S. 987, 108 S.Ct. 1288, 99 L.Ed.2d 499 (1988). Thus, the district court erred insofar as it purported to grant the government's motion pursuant to Fed.R.Civ.P. 56.
 
 
 10
 "We review de novo whether 'the Feres doctrine is applicable to the facts reflected in the record.' " Green v. Hall, 8 F.3d 695, 700 (9th Cir.1993) (quoting McGowan v. Scoggins, 890 F.2d 128, 129 (9th Cir.1989)), cert. denied, 513 U.S. 809, 115 S.Ct. 58, 130 L.Ed.2d 16 (1994). We have stated on several occasions in Feres cases that "[i]n reviewing an order dismissing an action for lack of subject matter jurisdiction, we must accept all of the plaintiff's factual allegations as true." McGowan, 890 F.2d at 136; see also Estate of McAllister v. United States, 942 F.2d 1473, 1474 n. 1 (9th Cir.1991), cert. denied, 502 U.S. 1092, 112 S.Ct. 1164, 117 L.Ed.2d 411 (1992). However, we have also held in other contexts that "unlike a Rule 12(b)(6) motion, a Rule 12(b)(1) motion can attack the substance of a complaint's jurisdictional allegations despite their formal sufficiency, and in so doing rely on affidavits or any other evidence properly before the court." St. Clair v. City of Chico, 880 F.2d 199, 201 (9th Cir.1989), cert. denied, 493 U.S. 993, 110 S.Ct. 541, 107 L.Ed.2d 539 (1989); see also Land v. Dollar, 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 1011 n. 4, 91 L.Ed. 1209 (1947) ("[W]hen a question of the District Court's jurisdiction is raised, either by a party or by the court on its own motion, ... the court may inquire, by affidavits or otherwise, into the facts as they exist."). This reliance by the district court on facts outside the complaint would be futile if on review we merely looked at the factual allegations in the complaint. To best reconcile these two views of 12(b)(1) motions, we will consider items outside the pleading that were considered by the district court in ruling on the 12(b)(1) motion, but resolve all disputes of fact in favor of the non-movant. Thus, although dismissal pursuant to the Feres doctrine properly should be labeled a dismissal for lack of jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), where the district court has properly considered items outside the complaint in considering a motion to dismiss, the standard we apply upon de novo review of the record is similar to the summary judgment standard that the district court purported to apply.
 
 B. Application of the Doctrine
 
 11
 Dreier argues that the district court erred by dismissing her FTCA claim pursuant to the Feres doctrine because her husband's injuries were not suffered incident to his service in the military. Though this is a close case, we believe that the Feres doctrine does not bar Dreier's claim, and reverse the district court's judgment in favor of the United States.
 
 
 12
 The FTCA provides: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674 (1994). In Brooks v. United States, 337 U.S. 49, 69 S.Ct. 918, 93 L.Ed. 1200 (1949), the Supreme Court held that two service members on furlough who were injured off-base by a negligently driven United States Army Truck were not barred from recovery under the FTCA because their injuries "had nothing to do with [their] army careers ... except in the sense that all human events depend upon what has already transpired." Id. at 52, 69 S.Ct. at 920.
 
 
 13
 One year later, in Feres v. United States, 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), the Court considered three claims by servicemen and their families against the United States and placed significant limitations on the ability of members of the military to recover from the United States under the FTCA. One of the claims alleged negligence on the part of the United States in the death of an enlisted man who was killed in a barracks fire caused by a defective heating plant. The other two claims alleged that medical malpractice by military doctors injured members of the service. The Court distinguished Brooks as a case in which the soldier's injuries "did not arise out of or in the course of military duty" in concluding "that the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service," and holding that all three suits were barred. Id. at 146, 71 S.Ct. at 159.
 
 
 14
 Since that time, courts applying the Feres doctrine have given a broad reach to Feres' "incident to service" test and have barred recovery by members of the armed services for injuries that at first blush may not have appeared to be closely related to their military service or status. "[P]ractically any suit that 'implicates the military judgments and decisions' ... runs the risk of colliding with Feres." Persons v. United States, 925 F.2d 292, 295 (9th Cir.1991) (quoting United States v. Johnson, 481 U.S. 681, 691, 107 S.Ct. 2063, 2069, 95 L.Ed.2d 648 (1987)).[3]
 
 
 15
 According to Feres and its progeny, the rationales for the doctrine are:
 
 
 16
 (1) The distinctively federal nature of the relationship between the government and members of its armed forces, which argues against subjecting the government to liability based on the fortuity of the situs of the injury; (2) the availability of alternative compensation systems; and (3) the fear of damaging the military disciplinary structure.
 
 
 17
 Id. at 294-95 (citations omitted); see also Johnson, 481 U.S. at 688-91, 107 S.Ct. at 2068-69. In cases where the existence of a Feres bar is not clear, we have looked to four factors to determine whether an activity is incident to military service:
 
 
 18
 (1) the place where the negligent act occurred;
 
 
 19
 (2) the duty status of the plaintiff when the negligent act occurred;
 
 
 20
 (3) the benefits accruing to the plaintiff because of his status as a service member; and
 
 
 21
 (4) the nature of the plaintiff's activities at the time the negligent act occurred.
 
 
 22
 Bon v. United States, 802 F.2d 1092, 1094 (9th Cir.1986) (citing Johnson v. United States, 704 F.2d 1431, 1436-41 (9th Cir.1983)).[4] We have also reluctantly recognized, however, that "[a] reconciliation of prior pronouncements on the [Feres doctrine] is not possible," and that a "comparison of fact patterns to outcomes in cases that have applied the Feres doctrine" is the most appropriate way to resolve Feres doctrine cases. Estate of McAllister, 942 F.2d at 1477. Thus, we look to the Ninth Circuit cases that are most factually analogous to the case at bar to determine whether the Feres doctrine bars Dreier's suit.
 
 
 23
 In Johnson, 704 F.2d 1431, Sergeant Freddie Johnson was on active duty and assigned to Malstrom Air Force Base in Montana. During his off-duty hours he worked as a bartender at the Noncommissioned Officers Club ("NCO Club") located on the base. After completing his normal eight hour tour of duty for the day, Johnson and another sergeant, Hay, reported to work at the NCO Club at 6 p.m. Hay, Johnson, and another sergeant who was the night manager of the club, decided to pool their tips and have a party at the club after it closed at 2 a.m. Under Montana law and military regulations, the club was required to close at 2 a.m., but the after-hours party continued until about 4:30 a.m., during which time the attendees consumed the liquor purchased from an off-base store, but used the Club's cups, ice, and mixers. Hay gave Johnson a ride to his off-base home at about 4:30 a.m., but the car collided with a tree about one mile outside the base, and Johnson was severely injured, becoming a quadriplegic. Hay was legally intoxicated at the time of the accident. Johnson's administrative claim with the United States was denied, and he brought suit under the FTCA against the government.
 
 
 24
 We noted that "the most persuasive justification for the Feres doctrine is the potential impact of civil suits on military discipline," and looked at the four factors used to determine whether an injury is suffered "incident to service" to determine whether allowing Johnson a cause of action against the government "would directly implicate the interests that the Feres doctrine was designed to protect." Id. at 1436. While the on-base location of the government's negligent act-permitting the NCO club to remain open after hours-weighed somewhat in favor of finding a Feres bar, we concluded that the "occurrence of government negligence on a military base should not automatically bar recovery." Id. at 1437.[5] However, the court concluded that the connection between "the situs of the negligence and Johnson's military service is so tenuous that location is not an important factor." Id. "The location of the NCO Club should not obscure the fact that Johnson was performing a non-military job in what was essentially a civilian context." Id.
 
 
 25
 While acknowledging that the duty status of the plaintiff when the negligence occurred is often considered, we concluded that active duty status of a serviceman who is off-duty at the time of the negligence is only relevant insofar as it may indicate that the serviceman "was engaging in an activity that is related in some relevant way to his military duties." Id. at 1438. We found no such relationship to military duties and concluded that Johnson "was in the same position that any civilian employee of the NCO Club might have been in at the time of the government's negligence." Id.
 
 
 26
 An often determinative factor in Feres cases is the fact that "the plaintiffs had access to the various recreational and medical benefits only because of their status as military personnel." Id. We determined, however, that Johnson's employment at the NCO club could "hardly be characterized as a privilege or benefit incident to his military service," id. at 1439, and concluded that his job at the club could not "logically be distinguished from second jobs held by other off-duty military personnel." Id.
 
 
 27
 Finally, emphasizing that the fundamental goal of the Feres doctrine is "to safeguard the military disciplinary structure from disruptive civil suits," we concluded that "the most relevant line of inquiry is whether or not the service member's activities at the time of injury are of the sort that could harm the disciplinary system if litigated in a civil action." Id. Examining the nature of Johnson's activities, we first concluded that "Johnson was not subject in any real way to the compulsion of military orders or performing any sort of military mission," at the time of the government's negligence. Id. "Second, at the time of the government's negligence, Johnson was subject to military discipline only in the very remotest sense." Id. at 1440. We found Johnson's case similar to that of the soldier in Mills v. Tucker, 499 F.2d 866 (9th Cir.1974), in which a petty officer who had a second job as a cook was killed in an automobile accident on a road maintained by the military adjacent to the base while returning to his on-base quarters. We concluded in Mills that the claim against the United States for negligently maintaining the road was not Feres barred because at the time of the accident the petty officer was "only in the remotest sense subject to military discipline." Id. at 867.[6]
 
 
 28
 Third, Johnson's activities did "not involve the sort of close military judgment calls that the Feres doctrine was designed to insulate from judicial review." 704 F.2d at 1440.
 
 
 29
 We are not dealing with a case where the government's negligence occurred because of a decision requiring military expertise and judgment. Rather, the government is negligent precisely because it failed to follow established military rules and procedures governing the operation of its NCO Club. A civilian patron of the Club could certainly recover for such negligence. Because there is simply no connection between off-duty work as a bartender and the kind of military interests that the Supreme Court intended to protect in Feres, Johnson should be allowed to recover.
 
 
 30
 Id. (footnotes omitted). Where, as in Johnson's case, there is "no relevant relationship between the service member's behavior and the military interests that might be jeopardized by civil suits, the Feres doctrine cannot bar recovery." Id.
 
 
 31
 In Roush v. United States, 752 F.2d 1460 (9th Cir.1985), an enlisted man was allegedly injured by another enlisted man, who was off-duty, dressed in civilian clothes, and working as a bouncer in the enlisted man's club, when the plaintiff was forcibly ejected from the club and pushed face-first into the pavement of the parking lot. The trial court dismissed the complaint, relying on Feres. Unlike the plaintiff in Johnson, Roush's complaint revealed that he "was present [in the club] at the time of his injury solely by virtue of being a member of the Marine Corps." Id. at 1464. However, we remanded to the district court, concluding that it was necessary to determine "whether the operation of the Club ... at the time of the accident [was] under the direct command of senior military personnel or that Roush and [the bouncer] were at the time subject to military discipline for any violation of the existing regulations governing such Club." Id. at 1465.
 
 
 32
 In Green, 8 F.3d 695, a member of the national guard was attending a weekend drill and training session at the Portland Air Base. On Friday night he participated in a parachute jump, and returned to base at 3 a.m. Green and another reservist, Coffman, slept at base while others returned home for the night, with orders to report for formation at 9 a.m. or 9:30 a.m. the next morning. Coffman and Green left the base in Coffman's car at about 7 a.m. to eat breakfast. Some evidence indicated that Green intended to return home to retrieve materials he would need to give a training session later in the day, and that Green and Coffman intended to bring back doughnuts for others in the company. Coffman's car collided with a Salvation Army truck at about 8:45 a.m., killing Coffman and severely injuring Green, who sued Coffman's estate. We held that the estate was not entitled to Feres immunity because Green was not injured "incident to service." Id. at 700. "Green's trip was ... a 'distinctly nonmilitary act [ ],' since it was not done under orders, was not intended to benefit the military, and did not occur on military property." Id.
 
 
 33
 In other cases, we have found that a military person's injuries were suffered "incident to service" even though they were not on duty. In Coffey v. United States, 324 F.Supp. 1087 (S.D.Cal.1971), aff'd 455 F.2d 1380 (9th Cir.1972), a United States Marine was killed while riding as a passenger in an automobile struck by a civilian train while at an on-base intersection of a government maintained private road and railroad tracks. The Marine was on his way to the base's exit for off-post liberty. The Marine's parents alleged that the government failed properly to mark and guard the railroad crossing. The district court emphasized the fact that the accident occurred on the base, and concluded that the claim was barred because "Feres can only be explained on the ground that the enforcement of army discipline in general is more difficult if persons involved in enforcing discipline may be treated as the causative agents of suits against the United States brought by persons who are subjects of army discipline." 324 F.Supp. at 1088. We affirmed in a three sentence opinion, concluding that Feres barred Coffey's claim. 455 F.2d 1380. Note, however, that we later deemphasized the importance of the location of the alleged negligence of the government in Johnson, 704 F.2d at 1436-37.
 
 
 34
 Two more recent cases bear factual similarities to the case at bar and further complicate our analysis. In Bon, the plaintiff was on active duty with the United States Navy when injured.
 
 
 35
 The accident occurred on or near a Navy Special Services facility at the Naval Training Center in San Diego. Bon and another individual were in a canoe rented from the Special Services Center. Her injuries occurred when a motor boat owned by the Government struck her canoe. The motor boat had also been rented from Special Services and was operated by an active duty service member. Both Bon and the operator of the motor boat were on authorized liberty and were not engaged in official duties.
 
 
 36
 The Naval Special Services Center is operated by the Naval Training Center and is under the direct responsibility of the commanding officer of the Naval Training Center. The purpose of the Special Services Center is to "provide for Navy personnel and their dependents a varied program of wholesome and constructive off-duty leisure and recreation activities which will effectively contribute to the mental and physical well being of the participants." (Special Services Recreation Manual). Base rules and regulations govern the rental and operation of boats at the Naval Training Center. In addition, Special Service Department guidelines also govern the rental services. At all times relevant, both Bon and the operator of the motor boat were subject to military discipline for any violations of these rules, regulations, and guidelines.
 
 
 37
 802 F.2d at 1093 (footnote omitted).
 
 
 38
 Looking at the four factors discussed in Johnson, we found that the location of the accident and the fact that both individuals involved in the accident were active duty service members weighed slightly in favor of a Feres bar. Id. at 1095. The benefits accruing to plaintiff because of her military service and the nature of her activities at the time of her injury weighed even more heavily in favor of a Feres bar. Id. Unlike the plaintiff in Johnson, Bon "did not occupy a status similar to that of any civilian with respect to her presence on and use of the Special Service Center's facilities." Id. Rather, the record indicated "that use of the [Center] was restricted to members of the military and employees of the Department of Defense and their guests and dependents." Finally, the nature of the activity was such that Bon was subject to discipline for specific rules governing the use of Special Service facilities and equipment. We distinguished the case from Johnson, in which the plaintiff "was subject to military discipline only in the sense that members of the military are at all times subject to the orders of their commanding and superior officers," because "Bon was subject to military orders and regulations for the particular activity in which she was engaged." Id. at 1096 (emphasis added).[7]
 
 
 39
 In Millang v. United States, 817 F.2d 533 (9th Cir.1987), cert. denied, 485 U.S. 987, 108 S.Ct. 1290, 99 L.Ed.2d 500 (1988), the plaintiff, while off-duty, attended a picnic at a park on a Marine Corps air station. The picnic was an informal gathering of servicemen, their families, and guests. In the late afternoon, an on-duty military police officer drove his military police vehicle to the picnic site. It was unclear from the record whether he arrived in response to an official summons or stopped by the site on his own. The officer left his vehicle, horseplay ensued, and someone threatened to spray him with beer. He rushed back to his truck and began to speed off. Millang was severely injured when he threw a small child that had wandered in front of the truck to safety. Millang received a disability discharge and government disability benefits, and all his medical bills had been paid by the government at the time of suit. The district court found Feres inapplicable, and Millang was awarded a significant sum under the FTCA.
 
 
 40
 We held that the key inquiry in determining whether an injury was suffered "incident to service" is " 'whether the suit requires the civilian court to second-guess military decisions, ... and whether the suit might impair essential military discipline.' " Id. at 535 (quoting United States v. Shearer, 473 U.S. 52, 57, 105 S.Ct. 3039, 3043, 87 L.Ed.2d 38 (1985)). We found that Feres prohibits not only those suits that directly call into question military decisions, but also " 'the type of claims that, if generally permitted, would involve the judiciary in sensitive military affairs at the expense of military discipline and effectiveness.' " Id. (quoting Shearer, 473 U.S. at 59, 105 S.Ct. at 3044) (emphasis in original).
 
 
 41
 Although Millang does not specifically challenge a military decision in this case, a claim that an on duty soldier acted negligently while discharging his responsibilities in an area subject to military control is the type of claim that could well call military decisions into question. For example, there might be an inquiry into whether [the officer] was sent to the area by his superiors and why, a matter that is in fact in dispute here. Other plaintiffs bringing similar suits could allege inadequate supervision or training, requiring military personnel to defend their actions in court. Moreover, the military police have the express duty of enforcing military discipline. A lawsuit that challenges the conduct of an on-duty military police officer acting within the scope of his authority on a military base also challenges the enforcement of military discipline. That is precisely what Feres sought to prevent.
 
 
 42
 Id. Like the plaintiff in Bon, Millang "enjoyed the use of the picnic area solely by virtue of his status as a serviceman." Id. In addition, all the participants in the picnic were subject to military statutes, regulations and orders. Id. The totality of the circumstances led the court to conclude that Millang's suit was Feres barred.
 
 
 43
 These cases reflect the fine distinctions that are often determinative when the Feres doctrine is applied to a particular fact situation. Considering the totality of the circumstances, we conclude that his claim is not barred by Feres. It is undisputed that Ronald was on Fort Lewis when he was killed. Though Dreier's presence on the base at the time of his death weighs in favor of a Feres bar, as Johnson, 704 F.2d at 1437, and subsequent cases indicate, the situs of his injury is not determinative.
 
 
 44
 The fact that Ronald had been released from duty only for the day is also a relevant factor.[8] While in Bon the fact that Bon was an active duty service person weighed in favor of a Feres bar, in Johnson, the court concluded that Johnson "was in the same position that any civilian employee of the NCO Club might have been in at the time of the government's negligence," 704 F.2d at 1438, so Johnson's active duty status was not controlling. Likewise, based on the record before us, Ronald's presence at the Solo Point area was indistinguishable from that of a civilian participating in the same leisure activities. Under base rules, civilians can gain access to areas of the base by obtaining a permit. There is evidence that in practice, the public can use the area without obtaining a pass or passing through any checkpoints. Thus, as an individual drinking beer and swimming during his leisure time in an area to which the public has access, Ronald was in the same position as any civilian would have been at the time of the government's negligence. Even if the fact that Ronald's off-duty time was limited to the afternoon weighs slightly in favor of a Feres bar, this factor is not determinative.
 
 
 45
 The final two Johnson factors, the benefits accruing to Ronald from his military status and the nature of his activities at the time of his death, are what we believe make Ronald's case more similar to Johnson than to Millang and Bon. Unlike the plaintiffs in Millang and Bon, in which the access to the picnic area and the Special Services Center was limited to military personnel and their guests and dependents, the Solo Point Area was generally open to the public, at least with an easily-acquired pass. It is true that a serviceman's injuries can be incident to service even though the public has access to the site at which the government's negligence occurred. See, e.g., Veillette v. United States, 615 F.2d 505, 507 (holding that Feres barred a wrongful death claim by family of deceased member of Air Force against a Navy hospital in Guam, even though civilians were often treated at the hospital). However, in Veillette, the serviceman himself was brought to the Navy hospital because he was a member of the military; in the case at bar, there is no evidence that Ronald and his three companions were present at Solo Point because of their military status. Like the bartending job of the plaintiff in Johnson, Ronald's ability to use the Solo Point area "can hardly be characterized as a privilege or benefit incident to his military service." 704 F.2d at 1439.
 
 
 46
 Finally, as stated in Johnson, "the most relevant line of inquiry is whether or not the service member's activities at the time of injury are of the sort that could harm the disciplinary system if litigated in a civil action." Id. The government argues that Ronald was subject to direct military control at the time of his death because of the presence of his immediate superior, the regulations governing land use on the base, and the fact that he was subject to immediate recall. Adopting the government's rationale, however, would bar recovery against the government by any soldier injured on military property, an absolutist position rejected by Johnson. Instead, like the plaintiff in Johnson, Ronald "was not subject in any real way to the compulsion of military orders or performing any sort of military mission," id., and "was subject to military discipline only in the very remotest sense." Id. at 1440. Unlike the plaintiff in Bon, Ronald was not "subject to military orders and regulations for the particular activity in which [he] was engaged." 802 F.2d at 1096 (emphasis added).
 
 
 47
 Questioning the government's negligence in securing the area around the sluice will "not involve the sort of close military judgment call that the Feres doctrine was designed to insulate from judicial review." Johnson, 704 F.2d at 1440. Indeed, many, if not all of the employees directly overseeing the water treatment plant were civilians. The court in Millang was particularly concerned about the propriety of questioning the actions of an on-duty military policeman, and his superiors who were generally responsible for his actions, and whose orders may have been responsible for dispatching him to the picnic site. Millang, 817 F.2d at 535. This case makes no allegations of inadequate military supervision or training, but rather alleges the same type of negligence that could be alleged against a completely private water treatment plant.[9]
 
 
 48
 Our precedents are not undermined by United States v. Johnson, 481 U.S. 681, 107 S.Ct. 2063, 95 L.Ed.2d 648 (1987), in which the Supreme Court held that the widow of a United States Coast Guard helicopter pilot could not bring an FTCA claim against the United States for his death resulting from the alleged negligence of an FAA employee during a rescue mission. In Johnson, the Court of Appeals for the Eleventh Circuit, while acknowledging that the Coast Guard pilot's death occurred while he was performing a military mission, determined that military discipline would not be affected by the suit because the alleged tortfeasor was not a member of the military. Id. at 684-85, 107 S.Ct. at 2065-66. The Supreme Court rejected this approach, stating that the issue in Feres cases has always been whether a service member's injuries " 'arise out of or are in the course of activity incident to service.' " Id. at 686, 107 S.Ct. at 2066 (quoting Feres, 340 U.S. at 146, 71 S.Ct. at 159). "Although all of the cases decided by this Court under Feres have involved allegations of negligence on the part of members of the military, this Court has never suggested that the military status of the alleged tortfeasor is crucial to the application of the doctrine." Id. In observing the disruption to military effectiveness that could be caused by such suits, the court held that "[e]ven if military negligence is not specifically alleged in a tort action, a suit based upon service-related activity necessarily implicates the military judgments and decisions that are inextricably intertwined with the conduct of the military mission." Id. at 691, 107 S.Ct. at 2069 (emphasis added).
 
 
 49
 As noted by the Supreme Court in Johnson, its reasoning was completely consistent with our opinion in Uptegrove v. United States, 600 F.2d 1248 (9th Cir.1979). See 481 U.S. at 685 & n. 3, 107 S.Ct. at 2065-66 & n. 3. In Uptegrove, we concluded that where a service member's presence on an airplane that crashed was incident to military service, the fact that the alleged tortfeasor was an FAA employee and not a member of the military did not prevent the application of the Feres doctrine. 600 F.2d at 1250-51. Thus, the Supreme Court's Johnson opinion did not change Ninth Circuit law. Though Johnson indicated "that the status of the alleged tortfeasor does not have the critical significance ascribed to it by the [Eleventh Circuit] Court of Appeals," 481 U.S. at 689, 107 S.Ct. at 2068, it stopped short of saying that the identity of the tortfeasor has no significance. Certainly where the status of the tortfeasor can shed light upon the injured service member's activities at the time of injury and whether the injured party's was acting "incident to service," it is a relevant inquiry. While under the Supreme Court's Johnson opinion the status of the tortfeasor is irrelevant once it has been determined that a service member was injured incident to service or performing a "service-related activity," because we have determined here that Ronald's injuries were not suffered "incident to service," the Supreme Court's Johnson opinion does not dictate a different result.
 
 
 50
 Looking at the overall concern about the effect on military discipline of claims against the government by members of the service, Dreier's suit does not raise the same concerns as cases such as Feres and Millang. Moreover, the existence of generous statutory disability benefits for service-related injuries, see Johnson, 481 U.S. at 688-89, 107 S.Ct. at 2068-69, does not weigh against recovery by Dreier because she was denied administrative compensation for Ronald's death. We conclude that there are insufficient Feres concerns present in this case to bar Dreier's FTCA claim against the United States.
 
 II. DISMISSAL BASED ON WASHINGTON STATE LAW
 
 51
 Because it relied on the Feres doctrine to dismiss Dreier's complaint, the district court did not consider the United States' arguments that the complaint is barred by Washington state law. "We are free, however, to affirm on any ground fairly presented by the record." Fosson v. Palace (Waterland), Ltd., 78 F.3d 1448, 1452 (9th Cir.1996). We review questions of state law de novo. National Union Fire Ins. Co. v. Showa Shipping Co., 47 F.3d 316, 322 (9th Cir.1995).
 
 
 52
 A. R.C.W. § 4.24.210: Immunity for Owners of Certain Recreational Property
 
 
 53
 The government argues that it is immunized from liability for Ronald's death by Revised Washington Code § 4.24.210, which reads, in relevant part:
 
 
 54
 (1) ... [A]ny public or private landowners or others in lawful possession and control of any lands whether designated resource, rural, or urban, or water areas or channels and lands adjacent to such areas or channels, who allow members of the public to use them for the purposes of outdoor recreation, which term includes, but is not limited to, ... picnicking, swimming, hiking, ... [and] boating, ... without charging a fee of any kind therefor, shall not be liable for unintentional injuries to such users.
 
 
 55
 * * * * * *
 
 
 56
 (3) ... Nothing in this section shall prevent the liability of such a landowner or others in lawful possession and control for injuries sustained to users by reason of a known dangerous artificial latent condition for which warning signs have not been conspicuously posted.
 
 
 57
 Wash. Rev.Code Ann. § 4.24.210 (West Supp.1996).
 
 
 58
 Dreier's contention that this provision does not apply to the Solo Point area is without merit; the record reveals that the public can acquire passes to use the area, or even use the area without such passes, and Dreier claims as much in arguing that the Feres doctrine does not apply to her claim. Because the waters around the area are open to the public, the area around the sluice qualifies as an area "adjacent to such areas." Id.[10]
 
 
 59
 The main issue is whether the channel, considered in conjunction with its surroundings, rather than in isolation, Van Dinter v. City of Kennewick, 121 Wash.2d 38, 846 P.2d 522, 525 (1993), was a "known dangerous artificial latent condition," Wash. Rev.Code Ann. § 4.24.210, so as to negate the immunity that would otherwise apply to the United States for opening property to the public. "As written, the four terms-'known', 'dangerous', 'artificial', and 'latent'-modify 'condition', not one another." Van Dinter, 846 P.2d at 526. There is no dispute that the sluice was artificial and dangerous. "Known" refers to the landowner's knowledge of the condition. Id. at 525. There is substantial evidence in the record that the government knew about the dangerous condition of the sluice.
 
 
 60
 The government contends that "the dangers presented by the water treatment facility sluice and outfall are inherent, open, and obvious," so the danger was not "latent," as required for the exception to the statute. For the exception to apply, the condition that causes the injury must have been latent; a party may not recover for an injury caused by latent dangerous aspects of a patent condition. Id. at 526. "The dispositive question is whether the condition is readily apparent to the general class of recreational users, not whether one user might fail to discover it." Chamberlain v. Department of Transp., 79 Wash.App. 212, 901 P.2d 344, 348 (1995) (finding based on pictures submitted to the court that the danger existing on a bridge was readily apparent to recreational users and affirming summary judgment). "Whether a condition is latent or patent can create a factual question in appropriate circumstances." Id.
 
 
 61
 The government argues that the condition of the sluice was patent under Tennyson v. Plum Creek Timber Co. 73 Wash.App. 550, 872 P.2d 524 , review denied, 124 Wash.2d 1029, 883 P.2d 327 (1994), in which the court held that the condition of a gravel pile that led to a motorcyclist's injury was patent even though the condition could not be seen from the direction that the motorcyclist approached, because the condition "was in plain view and readily apparent to anyone who examined the gravel mound as a whole." Id. at 527. The videotape and photographs in the record indicate that the danger of the sluice was patent when viewed from its outfall into Puget Sound. The exhibits also demonstrate, however, that the sluice, which runs down the hill for some 400 feet, is almost completely obscured by nature in many areas. Thus, the latent condition of the sluice at certain points would not be apparent to any recreational user from any angle. The record also reveals admissions by the government that there were not adequate fences or warning signs in the area around the sluice. Taking the facts in the light most favorable to Dreier, a question of fact remains regarding whether the condition of the sluice was latent or patent.
 
 
 62
 B. R.C.W. 5.40.060: Wrongful Death Defense Where the Victim Was Intoxicated When Killed
 
 
 63
 The United States also argues that it was entitled to summary judgment on Dreier's FTCA claim because of Revised Washington Code § 5.40.060, which reads in relevant part:
 
 
 64
 [I]t is a complete defense to an action for damages for personal injury or wrongful death that the person injured or killed was under the influence of intoxicating liquor or any drug at the time of the occurrence causing the injury or death and that such condition was a proximate cause of the injury or death and the trier of fact finds such person to have been more than fifty percent at fault.
 
 
 65
 Wash. Rev.Code Ann. § 5.40.060 (West 1995). While in the instant case Ronald's blood alcohol content of .16 percent may have contributed to his death, it is not by any means certain from the record before us that Ronald was more than fifty percent at fault for his death, especially in light of admissions by the government that the area around the sluice is unsafe. Ronald's percentage of fault must be determined by a finder of fact. See, e.g., Hansen v. Friend, 118 Wash.2d 476, 824 P.2d 483, 487-88 (1992).
 
 CONCLUSION
 
 66
 For the reasons stated above, we find that Dreier's claim is not barred by the Feres doctrine and that the district court's dismissal cannot be otherwise affirmed by relying on Washington state law. We REVERSE the district court's dismissal of Dreier's FTCA claim against the United States and REMAND.
 
 
 
 *
 Hon. Thomas M. Reavley, Senior United States Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 Dreier's specific duties as a clerk, the office organization, and the professional relationship between Dreier and the other men who were at Solo Point at the time of Dreier's death are not clear from the record
 
 
 [2]
 The record contains several admissions on behalf of the United States that the area around the channel was not adequately fenced or signed at the time of Dreier's death
 
 
 [3]
 "This circuit has extended the application of Feres to suits between individual members of the military, recognizing an 'intramilitary immunity' from suits based on injuries sustained incident to service." Lutz v. Secretary of the Air Force, 944 F.2d 1477, 1480-81 (9th Cir.1991)
 
 
 [4]
 This Johnson case involved a different plaintiff named Johnson than the Johnson case considered by the Supreme Court. All subsequent references to Johnson will refer to the Ninth Circuit case, unless otherwise specified
 
 
 [5]
 See also Lutz, 944 F.2d at 1486 n. 11 ("The fact that the activity took place on base is not itself controlling.")
 
 
 [6]
 See also Taber v. Maine, 67 F.3d 1029, 1053 (2d Cir.1995) (holding that off-duty serviceman injured in automobile collision with another off-duty serviceman who had become intoxicated on base was not barred by Feres from suing the other driver); Parker v. United States, 611 F.2d 1007, 1015 (5th Cir.1980) (holding that an off-duty serviceman on a four-day furlough driving a civilian vehicle towards his off-base home was not acting "incident to service" when he was involved in an on-base collision with a vehicle operated by another serviceman); Troglia v. United States, 602 F.2d 1334, 1340 (9th Cir.1979) (holding that a soldier, Troglia, injured on government owned land located one-half mile from the military base when his car collided with an automobile driven by an individual who had become intoxicated at the NCO club would not be barred by Feres from recovering from the government unless it was determined that Troglia was engaged in an activity incident to service)
 
 
 [7]
 Because the record clearly revealed the rules and regulations governing the Center, remand was not necessary, as it was in Roush. Id. at 1095
 
 
 [8]
 We believe that our statement in Persons, 925 F.2d at 296 n. 6, that "[t]he relevant distinction ... runs between servicepersons who are on 'active duty' and those who have been discharged or are on furlough, not between 'off duty' and 'on-duty' servicepersons," 925 F.2d at 296 n. 6, was mere dicta. Persons involved a medical malpractice claim against a naval hospital, a situation squarely covered by other Feres doctrine cases and Feres itself, and the decedent's duty status was not central to a determination of the applicability of the Feres doctrine. Johnson clearly indicated that a soldier's duty status at the time of injury was relevant, as have Feres doctrine cases decided subsequent to Persons. See, e.g., Green, 8 F.3d at 700 (army reservist participating in weekend drills was injured "before he was due at morning formation"). While Ronald's case would be stronger if he were on furlough, rather than merely off-duty for the afternoon, the fact that he was off-duty is certainly not irrelevant to a determination whether his injuries were suffered "incident to service."
 
 
 [9]
 See also Elliott v. United States, 13 F.3d 1555, 1560 (11th Cir.) (holding that claim against government for negligent maintenance of on-base housing, resulting in carbon monoxide poisoning of serviceman on leave and wife, was not barred by Feres, in part because "[p]roviding and maintaining single-family housing for military personnel does not involve the federal judiciary in sensitive military affairs" or questioning of military orders), aff'd by evenly divided en banc court, 37 F.3d 617 (11th Cir.1994) (en banc). But see Lauer v. United States, 968 F.2d 1428, 1430 (1st Cir.) (holding that suit by serviceman alleging inadequate lighting of road maintained by Navy outside base causing serviceman to be hit by car while off-duty and walking on the road was Feres barred because "the question of whether to light a highway is a military decision"), cert. denied, 506 U.S. 1033, 113 S.Ct. 812, 121 L.Ed.2d 685 (1992); Miller v. United States, 643 F.2d 481, 494 (8th Cir.1981) (en banc ) (holding that family of serviceman performing off-duty work for private contractor who was killed when his ladder came in contact with electric line controlled by the Army was barred by Feres from suing the government because the commanding officer of the base was ultimately responsible for the entire base and if suit were allowed "the conduct of Miller's military superior would be called in question in the civil courts, a circumstance that might well have [a] destructive effect on military authority and discipline"). In cases such as Johnson, Roush, and Mills, this circuit has not been so concerned about questioning aspects of the operation of a military base that are not related to traditional military functions
 
 
 [10]
 The possibility that Ronald should be treated as a trespasser on the land around the sluice for the purpose of determining the government's duty toward him does not provide an alternative ground for affirming the district court. If the government demonstrates that Ronald was a trespasser on land that was not open to the public, Dreier would be required to demonstrate that the United States had engaged in "willful or wanton" misconduct to be able to recover for wrongful death. Johnson v. Schafer, 110 Wash.2d 546, 756 P.2d 134, 135 (1988)
 Wanton misconduct is not negligence, since it involves intent rather than inadvertence, and is positive rather than negative. It is the intentional doing of an act, or intentional failure to do an act, in reckless disregard of the consequences, and under such surrounding circumstances and conditions that a reasonable man would know, or have reason to know, that such conduct would, in a high degree of probability, result in substantial harm to another.
 Id. (quoting Adkisson v. Seattle, 42 Wash.2d 676, 258 P.2d 461, 467 (1953)) (emphasis in original). Considering the facts in the light most favorable to Dreier, there is an issue of material fact regarding whether the United States engaged in wanton misconduct, especially in light of the United States' admissions that the area around the channel was not adequately fenced or signed.