THE OTTER PROJECT; ENVIRONMENTAL DEFENSE CENTER, Plaintiff,

v.

Ken SALAZAR, et al., Defendants.

No. C 09–04610 JW.

United States District Court, N.D. California, San Jose Division.

May 5, 2010.

**1000**

Brian Paul Segee, Linda J. Krop, Santa Barbara, CA, for Plaintiff.

Lawson Emmett Fite, U.S. Department of Justice, Washington, DC, Benjamin Zachary Rubin, Nossaman LLP, Irvine, CA, George J. Mannina, Jr., Nossaman LLP, Washington, DC, for Defendants.

1. Plaintiff also names Ken Salazar, Secretary of the Interior, Sam Hamilton, Director of U.S. Fish and Wildlife Service as Defendants.

2. (hereafter, "Motion to Dismiss," Docket Item No. 32.)

3. (Motion of California Sea Urchin Commission, Peter Halmay, Harry Liquornik, Califor-

nia Abalone Association, and Sonoma County Abalone Network for Leave to Intervene Under FRCP 24, hereafter, "Motion to Intervene," Docket Item No. 19.)

4. (First Amended Complaint for Declaratory and Injunctive Relief, hereafter, "FAC," Docket Item No. 24.)

## ORDER GRANTING CSUC'S MOTION TO INTERVENE; DENYING DEFENDANTS' MOTION TO DISMISS

JAMES WARE, District Judge.

### I. INTRODUCTION

The Otter Project; Environmental Defense Center ("Plaintiff") brings this action against the United States Department of Interior and the United States Fish and Wildlife Service (collectively, "Defendant")[1] for declaratory and injunctive relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1). Plaintiff alleges that Defendants violated the APA by refusing to make a determination as to whether the translocation program of California sea otters has failed after its commencement nearly 24 years ago.

Presently before the Court are Federal Defendants' Motion to Dismiss First Amended Complaint for Lack of Subject-Matter Jurisdiction Pursuant to Fed. R.Civ.P. 12(b)(1),[2] and Motion of California Sea Urchin Commission, et al. (collectively, "Proposed Intervenors") for Leave to Intervene.[3] The Court conducted a hearing on March 22, 2010. Based on the papers submitted to date and oral argument, the Court GRANTS CSUC's Motion to Intervene and DENIES Defendants' Motion to Dismiss.

### II. BACKGROUND

In a First Amended Complaint filed on December 23, 2009,[4] Plaintiffs allege as follows:

The southern sea otter species, also called the California sea otter, historically numbered between 16,000 and 18,000 individuals off the California Coast. (FAC ¶ 47.) Although their population was decimated by the fur trade, and they were believed to be extinct by the early 1900s, a small group of fewer than fifty sea otters was discovered off the Central California coast in 1938. (*Id.*) Despite the subsequent expansion of their population, the southern sea otter continued to be highly imperiled, and in 1977 was listed as a threatened species under the ESA. (*Id.* ¶ 48.)

In 1980, the Marine Mammal Commission ("MMC") concluded that "a transplant of sea otters to an area substantially removed from the present California range seems to offer the only practical means for reducing the threat posed by potential oil spills ... a transplant should be undertaken as soon as possible." (FAC ¶ 50.) In 1982, the Fish and Wildlife Service ("FWS") adopted the MMC's recommendation, identifying the need to establish, through translocation, one or more sea otter populations as a primary management action necessary to ensure recovery. (*Id.* ¶ 51.)

On November 7, 1986, Congress passed Public Law 99–625, authorizing, but not requiring, FWS to develop a sea otter translocation plan. (FAC ¶ 61.) In the event that the FWS chose to exercise its authority to develop a translocation plan, Congress directed FWS to designate an otter-free management zone surrounding the translocation zone on San Nicolas Island off the southern California coast. (*Id.* ¶ 62.) Within the no-otter zone, encompassing the entire southern California coastline aside from San Nicolas island, FWS was to "use all feasible non-lethal means and measures to capture any sea otter ... and return it to either the translocation zone or to the range of the parent population." (*Id.*)

On August 11, 1987, FWS finalized its rulemaking and associated NEPA process designating the waters around San Nicolas Island as the translocation zone, with all other California waters and islands south of Point Conception designated as the no-otter management zone. (FAC ¶ 65.) That same year, in accordance with the new rule, FWS began translocating sea otters to San Nicolas Island, releasing 140 individuals between August 1987 and March 1990. (*Id.* ¶ 83.) The translocation effort was plagued with difficulties from the beginning, and resulted in much higher levels of otter deaths and disappearances than predicted during the rulemaking process. (*Id.* ¶ 84.) By March 1991, only fourteen individual otters remained within the translocation zone. (*Id.*) In 1991, FWS "stopped translocating sea otters to San Nicolas Island due to high rates of dispersal and poor survival." (*Id.* ¶ 86.)

As early as 1990, FWS monitoring reports noted that the translocation program appeared to meet at least one of the failure criteria contained in the 1987 rule. (FAC ¶ 89.) In 1992, FWS prepared the first of several draft evaluations of the translocation and management rule, none of which have ever been finalized. (*Id.* ¶ 90.) At that time, FWS "concluded that the management zone could not be maintained in the long-term using available non-lethal techniques, and that the persistence of the management zone would reduce the options available to recover the southern sea otter and likely delay recovery." (*Id.* at 11) (quoting July 21, 2000 Biological Opinion, Reinitiation of Formal Consultation on the Containment Program for the Southern Sea Otter ("Biological Opinion").)

In the Winters of 1997–98 and 1998–99, large groups of more than 100 sea

otters moved of their own volition south of Point Conception into the waters of southern California. (FAC ¶ 106.) At this same time, sea otter populations in the parent central coast population experienced significant declines. (*Id.* ¶ 107.) On July 19, 2000, FWS issued a final biological opinion that concluded that "the primary action for promoting the recovery of this population at this time is the cessation of the 'otter-free management zone' in the southern California Bight" and that "the continuing containment program and restricting the southern sea otter to the area north of Point Conception ... is likely to jeopardize [the southern sea otter's] continued existence." (*Id.* ¶¶ 114–15.) FWS further stated its intent "to undertake a comprehensive review of the translocation program under NEPA" and evaluate whether it should be continued, modified, or terminated." (*Id.* ¶ 118.) In an April 2001 "scoping" report, FWS stated that it would "publish and distribute a draft supplemental EIS in the Fall of 2001." (*Id.* ¶¶ 122–23.)

In a 2005 draft evaluation, FWS concluded that at least one of the failure criteria had been met. (FAC ¶ 128.) The draft evaluation stated, "we conclude that the translocation program has failed to fulfill its purpose and that our recovery and management goals for the species cannot be met by continuing the program." (*Id.* ¶ 130.)

On the basis of the allegations outlined above, Plaintiff alleges a claim for relief for Violation of the Administrative Procedure Act, 5 U.S.C. § 706(1).

Presently before the Court is Federal Defendants' Motion to Dismiss for lack of subject matter jurisdiction.

### III.  STANDARDS

Rule 12(b)(1) of the Federal Rules of Civil Procedure provides for a motion to dismiss for lack of subject-matter jurisdiction. A Rule 12(b)(1) motion may be either facial, where the inquiry is confined to the allegations in the complaint, or factual, where the court is permitted to look beyond the complaint to extrinsic evidence. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir.2004). On a facial challenge, all material allegations in the complaint are assumed true, and the question for the court is whether the lack of federal jurisdiction appears from the face of the pleading itself. *See Wolfe*, 392 F.3d at 362; *Thornhill Pub'g Co. v. Gen. Tel. Elecs.*, 594 F.2d 730, 733 (9th Cir.1979). When a defendant makes a factual challenge "by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction." *Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir.2004). The court need not presume the truthfulness of the plaintiff's allegations under a factual attack. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.2000); *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir.1983). However, in the absence of a full-fledged evidentiary hearing, disputes in the facts pertinent to subject matter are viewed in the light most favorable to the opposing party. *Dreier v. United States*, 106 F.3d 844, 847 (9th Cir.1996). The disputed facts related to subject-matter jurisdiction should be treated in the same way as one would adjudicate a motion for summary judgment. *Id.*

### IV.  DISCUSSION

#### A.  Motion to Intervene

■ Proposed intervenors Peter Halmay, Harry Liquornik, California Sea Urchin Commission ("CSUC"), California Abalone Association ("CAA"), and Sonoma County Abalone Network ("SCAN") (collectively, "Proposed Intervenors") move to

intervene in this action on the ground that they and their members are commercial fishermen whose ability to make a living is directly impacted by the presence of sea otters in waters off of the southern California coast. (Motion to Intervene at 3.) Plaintiff contends that proposed intervenors' are not entitled to intervene as of right, but does not oppose permissive intervention.[5]

Fed.R.Civ.P. 24(a)(2) provides:

On timely motion, the court must permit anyone to intervene who ... claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

Fed.R.Civ.P. 24(b) provides:

On a timely motion, the court may permit anyone to intervene who ... has a claim or defense that shares with the main action a common question of law or fact.... In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

Here, the Court finds that Proposed Intervenors at least meet the standard for permissive intervention. Proposed Intervenors moved to intervene at the earliest stage of the litigation, thus there is no issue as to timeliness. Furthermore, as commercial fishermen who depend upon the sea urchin and abalone fisheries located within the boundaries of the current sea otter management zone, the claims of Proposed Intervenors depend upon the same issues of law and fact that are at issue in this action. Finally, it does not appear to the Court that allowing permissive intervention here would cause any undue delay or prejudice the original parties' rights.

Since Plaintiff does not oppose permissive intervention, and Federal Defendants' do not express a position on the matter one way or the other, the Court does not find it necessary to reach the issue of intervention as of right.

Accordingly, the Court GRANTS CSUC's Motion to Intervene.

### B. *Motion to Dismiss*

■ Federal Defendants move to dismiss Plaintiffs' Complaint for lack of subject matter jurisdiction on the ground that it asks the Court to compel FWS to take action that is not legally required. (Motion to Dismiss at 1.) Plaintiff responds that FWS's regulations plainly establish a duty to prepare a failure determination.[6]

The Administrative Procedure Act ("APA") authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of the relevant statute." 5 U.S.C. § 702. The APA defines "agency action" as including "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id.* § 551(13). The APA further provides that a "reviewing court shall ... compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). The Supreme Court has held that "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 64, 124 S.Ct. 2373, 159 L.Ed.2d 137 (2004) (emphasis in original).

---

**5.** (Response in Partial Opposition to Motion of California Sea Urchin Comm'n et al. for Leave to Intervene, Docket Item No. 25.)

**6.** (Plaintiffs' Response in Opposition to Federal Defendants' Second Motion to Dismiss at 2, hereafter, "Opposition," Docket Item No. 35.)

In 1987, Congress enacted Public Law No. 99–625, which provides that "[t]he Secretary may develop and implement ... a plan for the relocation and management of a population of California sea otters from the existing range of the parent population to another location." Pub.L. No. 99–625, § 1(b), 100 Stat. 3500. Public Law No. 99–625 further provides that if the Secretary develops a plan, it must contain six elements, including the establishment of a "translocation zone," to which the experimental population will be relocated, and a "management zone," which surrounds the translocation zone and from which all otters are to be removed. *Id.* § 1(b)(4).

Pursuant to the authority granted by Public Law No. 99–625, FWS promulgated regulations designating the waters around San Nicolas Island as the translocation zone, with all other California waters and islands south of Point Conception designated as the no-otter management zone. 50 C.F.R. § 17.84(d). The regulations also stated:

> Determination of a failed translocation.—The translocation would generally be considered to have failed if one or more of the following conditions exists:
>
> (i) If, after the first year following initiation of translocation or any subsequent year, no translocated otters remain within the translocation zone and the reasons for emigration or mortality cannot be identified and/or remedied;
>
> (ii) If, within three years from the initial transplant, fewer than 25 otters remain in the translocation zone and the reason for emigration or mortality cannot be identified and/or remedied;
>
> (iii) If, after two years following the completion of the transplant phase, the experimental population is declining at a significant rate and the translocated otters are not showing signs of successful reproduction....
>
> (iv) If the Service determines, in consultation with the affected State and Marine Mammal Commission, that otters are dispersing from the translocation zone and becoming established within the management zone in sufficient numbers to demonstrate that containment cannot be successfully accomplished....
>
> (v) If the health and well-being of the experimental population should become threatened to the point that the colony's continued survival is unlikely, despite the protections given to it by the Service, State, and applicable laws and regulations....
>
> (vi) If, based on any one of these criteria, the Service concludes, after consultation with the affected State and Marine Mammal Commission, that the translocation has failed to produce a viable, contained experimental population, this rulemaking will be amended to terminate the experimental population, and all otters remaining within the translocation zone will be captured and all healthy otters will be placed back into the range of the parent population.

*Id.* § 17.84(d)(8).

It is undisputed that making a failure determination pursuant to 50 C.F.R. § 17.84(d)(8) constitutes a discrete agency action.[7] Thus, to determine whether the Court may compel agency action unlawfully withheld or unreasonably delayed pur-

---

7. (*See* Federal Defendants' Reply in Support of Motion to Dismiss First Amended Complaint at 5, hereafter, "Reply," Docket Item No. 38 ("The issue in the present case is not discreteness of the regulation but whether the regulation imposes any required action."); Opposition at 12–14.)

suant to § 706(1), the issue becomes whether the regulation requires FWS to make such a failure determination.

In analyzing § 17.84(d), the Court begins with the plain language. *See Bayview Hunters Point Comty. Advocates v. Metropolitan Transp. Comm'n*, 366 F.3d 692, 698 (9th Cir.2004). "A regulation should be construed to give effect to the natural and plain meaning of its words." *Id.* Here, the regulation provides the criteria that FWS must apply when making a determination of a failed translocation, and further provides the action FWS must take should it conclude that the translocation has failed, but it does not address directly whether such a determination is required in the first instance.[8] Since the plain language of the regulation is ambiguous as to whether a failure determination is a required action, the Court may consider FWS's intent in promulgating the rule. *See El Comite Para el Bienestar de Earlimart v. Warmerdam*, 539 F.3d 1062, 1072 (9th Cir.2008) (a court is "justified in considering administrative intent only if the regulation is ambiguous").

The regulation's enumeration of benchmarks for evaluating the success of the program at specific time intervals indicates that FWS contemplated that a failure determination would indeed occur. For example, two of the failure criteria depend upon the total number of otters remaining in the translocation zone one and three years respectively after the initiation of translocation. 50 C.F.R. § 17.84(d)(i)-(ii). If FWS was under no duty to ever actually undertake a failure determination, the inclusion of these specific benchmarks would be rendered meaningless. Such a result would violate "the basic rule of statutory construction ... that one provision should not be interpreted in a way which is internally contradictory or that renders other provisions of the same statute inconsistent or meaningless." *Bayview*, 366 F.3d at 700.

The actions of FWS in the years following the initiation of the translocation program provide further weight for a finding that making a failure determination is a required action under § 17.84(d). As alleged in the First Amended Complaint, FWS drafted several failure determinations between the enactment of the regulation in 1987 and the present. (*See* FAC ¶¶ 90, 128–30.) Although for reasons as yet unexplained, FWS never completed any of its failure determination drafts, the Court finds that the act of engaging in the drafting process itself demonstrates FWS's own understanding that it was under a duty to make a failure determination. Moreover, on numerous occasions, FWS made public statements indicating its intent to complete the failure determination, which themselves may constitute commitments binding the agency to take further action.[9] *See SUWA*, 542 U.S. at 71, 124

---

8. The parties devote considerable space in their briefs to the issue of whether the word "will" creates a mandatory action. (*See* Opposition at 15–18; Reply at 4.) However, the word "will" is used in the context of describing what is to occur should FWS make a determination that the translocation has failed. Thus, the regulation's use of the word "will" is not relevant to the question before the Court, whether FWS must undertake a failure determination in the first instance.

9. The public statements that Plaintiffs cite are: (1) statements in a 1995 draft failure evaluation that "a decision regarding success or failure of the program was anticipated in the next year," Biological Opinion at 15; (2) statements at a 1998 public hearing that "process of evaluating failure criteria would be commenced," Draft Evaluation of the Southern Sea Otter Translocation Program 1987–2004 at 22; (3) statements in the 2001 Draft Policy, 66 Fed.Reg. 6649, that a final determination, "including evaluation of the failure criteria developed for the program" would be completed by December 2002; and (4) statements made in prior litigation that "FWS expects to make a decision to continue, modi-

S.Ct. 2373 ("Of course, an action called for in a plan may be compelled when ... language in the plan itself creates a commitment binding on the agency.").

Finally, the history of the § 17.84(d) rulemaking process itself also weighs in favor of a finding that making a failure determination is a required, rather than discretionary, act. Specifically, in response to an official comment suggesting that "the Criteria for a Failed Translocation be included in the regulation as well as in the preamble of the rule,"[10] FWS stated:

> The Criteria for a failed Translocation are critical to whether or not the experimental population will achieve its intended purposes or have to be terminated, which would involve [FWS] evaluation and informal rulemaking procedures. Because they hold such importance to the future continuation of the experimental population as well as to future conflicts with fisheries and other uses in the translocation and management zones, the [FWS] agrees with the suggestion and has incorporated the Criteria for a Failed Translocation into the final regulation.

*Id.* The Court finds that FWS's decision to move the failure criteria from the preamble into the body of the rule itself, and the importance that FWS expressly imparted on the criteria for the future of the program, indicates FWS's intention to bind themselves to make a determination based on those criteria.

Since FWS enumerated criteria for determining whether the translocation program failed, and included benchmarks at specified time intervals for making such a

determination, the Court finds that FWS intended to make the failure determination a required action. FWS's actions subsequent to the initiation of the translocation program indicate that FWS understood that it was under an obligation to make a failure determination, engaging in a drafting process and making numerous public statements to the effect that the determination would be finalized in the near future. Thus, the Court finds that it has subject matter jurisdiction over this action pursuant to 5 U.S.C. § 706(1).[11]

Accordingly, the Court DENIES Federal Defendants' Motion to Dismiss.

## V. CONCLUSION

The Court GRANTS CSUC's Motion to Intervene and DENIES Defendants' Motion to Dismiss.

The parties shall appear for a Case Management Conference on **May 24, 2010 at 10 a.m.** On or before **May 14, 2010,** the parties shall file a Joint Case Management Statement. The Statement shall include, among other things, the parties' proposed schedules as to how the case should proceed.

---

fy, or terminate the program by 2002," Opposition, Ex. H at 3. Opposition at 21. Federal Defendants do not dispute that FWS did in fact make these statements.

**10.** *See* Comment 36, 52 Fed.Reg. at 29,764.

**11.** In their Reply brief, Federal Defendants withdrew their challenge to Plaintiff's standing at the pleading stage of the litigation with a reservation of rights. (Reply at 2.)